**In re Maria Isabel DURAN, an: incapacitated person.**

**Appeal of: Larry M. Johnson, the Health–Care Agent appointed by Maria Isabel Duran in her Durable Power of Attorney for Health Care.**

Superior Court of Pennsylvania.

Argued Jan. 10, 2001.
Filed Feb. 21, 2001.

Donald Ridley, Patterson, New York, and Stephen Langton, Lower Burrell, for appellant.

Margaret H. Drayden, Pittsburgh, amicus curiae.

Before FORD ELLIOTT, MUSMANNO, and KELLY, JJ.

KELLY, J:

¶ 1 Appellant, Larry M. Johnson, asks us to determine whether the trial court erred when it appointed an emergency

guardian for the express purpose of consenting to a blood transfusion for Maria Duran ("Maria"), a Jehovah's Witness. We hold that Appellant's issue is cognizable despite its technical mootness. We further hold that Maria's unequivocal refusal of blood transfusion therapy is protected by Pennsylvania common law and that the trial court erred when it appointed an emergency guardian to abridge this right. Finally, we conclude that Appellant was entitled to notice of the hearing to appoint an emergency guardian. Thus, we reverse the order of the trial court.

¶ 2 The relevant facts and procedural history of this appeal are as follows. In 1999, Maria Duran was 34 years old. She was the wife of Lionel Duran and mother of two teenage children. Of the four, only Maria was a Jehovah's Witness.[1]

¶ 3 Maria's deeply-held religious beliefs as a Jehovah's Witness did not preclude her from seeking advanced medical treatment or procedures. However, Maria's strict adherence to the written word of the Bible commanded her to abstain from blood products and blood transfusions. Thus, for example, when Maria needed a liver transplant, she sought a hospital that would accommodate her religious beliefs. Maria chose the University of Pittsburgh Medical Center ("the Center") because she was told the Center had performed liver transplants on Jehovah's Witnesses without the need for blood transfusions. In 1997, Maria traveled from New York to Pittsburgh to be evaluated as a candidate for a liver transplant procedure. During the visit, Maria specifically discussed her religious beliefs regarding blood transfusions with doctors and staff at the Center.

¶ 4 In anticipation of the transplant, Maria executed a durable power of attorney for medical care ("DPA") on February 5, 1998. The document stated in pertinent part:

> I am one of Jehovah's Witnesses. On the basis of my firmly held religious convictions, see *Acts* 15:28, 29, and on the basis of my desire to avoid the numerous hazards and complications of blood, **I absolutely, unequivocally and resolutely refuse homologous blood** (another person's blood) **and *stored* autologous blood** (my own stored blood) under any and all circumstances, no matter what my medical condition. This means no whole blood, no red cells, no white cells, no platelets, and no blood plasma no matter what the consequences. Even if health-care providers (doctors, nurses, etc.) believe that only blood transfusion therapy will preserve my life or health, I do not want it. Family, relatives or friends may disagree with my religious beliefs and with my wishes expressed herein. However, their disagreement is legally and ethically irrelevant because it is my subjective choice that controls. Any such disagreement should in no way be construed as creating ambiguity or doubt about the strength or substance of my wishes.

(Exception to Guardianship Order–Exhibit B, at 1) (emphasis in original). In her DPA, Maria also appointed Appellant, Larry M. Johnson, as her health-care agent.

¶ 5 A year later, the Center informed Maria that she was close to receiving a liver and advised her to move closer to Pittsburgh. Maria left New York to live with Appellant and his wife near Pittsburgh. Before leaving, Maria discussed her desire not to receive any blood transfusions with her husband and family members.

¶ 6 On July 19, 1999, Maria underwent her first liver transplant operation. Prior

---

**1.** It is unclear from the record what if any religious beliefs Maria's son held.

to the operation, Maria provided her doctors with copies of her DPA and reiterated her refusal to accept any blood transfusions. After the operation, Maria's body rejected the liver. A second operation was Maria's only chance for survival. Appellant, as Maria's appointed health-care agent, consented to the second transplant operation. Appellant had also consented to a kidney dialysis and a biopsy during the course of Maria's treatment. Maria's body rejected the second organ as well. Her failing liver caused her to slip into a comatose state. Maria's condition rapidly deteriorated and doctors estimated that without a blood transfusion she would die within the next twenty-four hours. Only with a transfusion, doctors projected, would Maria have a chance of survival.

¶ 7 On July 27, 1999, Maria's husband, Lionel Duran, orally petitioned the Orphans' Court to be appointed Maria's emergency limited guardian for the purpose of consenting to a blood transfusion. The court heard testimony from the treating physician, Dr. Stephen Bowles, Lionel Duran, and Maria's sister, Velma Santiago. A court-appointed attorney represented Maria. Appellant was not given notice of the hearing. At the conclusion of the

hearing, the Orphans' Court granted Lionel Duran's petition. Appellant filed exceptions to the court's order on August 3, 1999. Meanwhile, Maria's husband consented to the blood transfusions for Maria. Maria died on August 19, 1999.

■■ ¶ 8 On August 25, 1999, Lionel Duran withdrew his petition and asked the court to dismiss further proceedings. Appellant then filed a memorandum of law requesting the court to rule on his exceptions despite their technical mootness. The Orphans' Court, *en banc*, affirmed the order. Appellant filed this timely appeal.[2]

¶ 9 On appeal, Appellant raises the following issues:

SHOULD THIS CASE BE DISMISSED FOR TECHNICAL MOOTNESS?

DO A PATIENT'S COMMON LAW AND CONSTITUTIONAL RIGHTS OF BODILY SELF–DETERMINATION AND RELIGIOUS FREEDOM PROTECT HER RELIGIOUS–MOTIVATED REFUSAL OF MEDICAL TREATMENT FROM BEING OVERRIDDEN BY THE APPOINTMENT OF A GUARDIAN WITH AUTHORI-

2. As a preliminary matter, we note Appellant's standing to bring this appeal. The issue of standing is generally distinguishable from the issue of subject matter jurisdiction. *Hertzberg v. Zoning Board of Pittsburgh*, 554 Pa. 249, 255 n. 6, 721 A.2d 43, 46 n. 6 (1998); *see also Beers v. Unemployment Compensation Bd. of Review*, 534 Pa. 605, 611 n. 6, 633 A.2d 1158, 1161 n. 6 (1993); *Jones Memorial Baptist Church v. Brackeen*, 416 Pa. 599, 602, 207 A.2d 861, 863 (1965). *Compare In Re Adoption of W.C.K.*, 748 A.2d 223 (Pa.Super.2000) and *Grom v. Burgoon*, 448 Pa.Super. 616, 672 A.2d 823, 824–825 (1996) (holding issue of standing not distinguishable from subject matter jurisdiction where cause of action is statutory and legislature has designated who may bring action under statute). Therefore, the issue of standing cannot be raised *sua*

*sponte* and is waived if not properly raised. *Huddleston v. Infertility Center of America, Inc.*, 700 A.2d 453, 457 (Pa.Super.1997). *See also Miller v. Bistransky*, 451 Pa.Super. 433, 679 A.2d 1300, 1302 (1996) (holding issue of standing waived when not raised in exceptions); *Erie Indemnity Co. v. Coal Operators Casualty Co.*, 441 Pa. 261, 265, 272 A.2d 465, 467 (1971) (holding issue of capacity to sue waived unless raised in form of preliminary objection).

In the present case, no party has raised the issue of standing. Further, this case is not a statutory cause of action where the legislature has designated who may bring an action under a specific statute. Accordingly, there is no issue of standing to preclude our review of Appellant's claim.

TY TO CONSENT TO THE TREATMENT IN QUESTION?

IF A PATIENT HAS APPOINTED HER OWN HEALTH–CARE AGENT BY MEANS OF A DURABLE POWER OF ATTORNEY, MAY ANOTHER PERSON WHOSE VALUES CONFLICT WITH THE PATIENT'S BE APPOINTED AS HER GUARDIAN TO MAKE HEALTH–CARE DECISIONS CONTRARY TO HER INSTRUCTIONS WITHOUT ANY SHOWING THAT HER HEALTH–CARE AGENT ACTED INAPPROPRIATELY?

IS A PATIENT WHO HAS APPOINTED HER OWN HEALTH–CARE AGENT DEPRIVED OF DUE–PROCESS OF LAW BY THE FAILURE OF HER AGENT TO RECEIVE NOTICE OF A PETITION TO APPOINT [A] GUARDIAN TO MAKE HEALTH–CARE DECISIONS FOR HER CONTRARY TO HER VALUES AND INSTRUCTIONS?

(Appellant's Brief at 2).

■ ¶ 10 Initially, Appellant argues that while his appeal is technically moot, it should not be dismissed because the appeal raises issues of important public interest, capable of repetition, yet apt to evade appellate review. We agree.

■ ¶ 11 Generally, an actual claim or controversy must be present at all stages of the judicial process for the case to be actionable or reviewable. *Plowman v. Plowman*, 409 Pa.Super. 143, 597 A.2d 701, 705 (1991). If events occur to eliminate the claim or controversy at any stage in the process, the case becomes moot. *Id.* Even if a claim becomes moot, we may still reach its merits if the issues raised in the case are capable of repetition, yet likely to continually evade appellate review. *Id.See also In Re Fiori*, 543 Pa. 592, 600 n. 4, 673 A.2d 905, 909 n. 4 (1996) (holding death of

patient did not preclude appellate review where issue was of important public interest, capable of repetition, yet apt to elude appellate review); *Commonwealth v. Bernhardt*, 359 Pa.Super. 413, 519 A.2d 417, 420 (1986) (holding exception to mootness doctrine exists where "(1) the question involved is capable of repetition but likely to evade review, or (2) the question involved is one of public importance"). Therefore, if the issues raised by an appeal are "substantial questions" or "questions of public importance," and are capable of repetition, yet likely to evade appellate review, then we will reach the merits of the appeal despite its technical mootness. *Id.* Finally, in *In Re Estate of Dorone*, 349 Pa.Super. 59, 502 A.2d 1271 (1985), *appeal granted*, 511 Pa. 609, 515 A.2d 893 (1986), *affirmed*, 517 Pa. 3, 534 A.2d 452 (1987), this Court noted

> There is a large class of other Jehovah's Witnesses, and it **is** reasonably likely that at least some of these will be involved in emergencies in which a doctor will seek a court order authorizing a transfusion. Moreover, the issues raised by this case are capable of evading review if the general rule of mootness is applied, for a transfusion ordered by a court in an emergency will always be given before the appellate process can be completed. Finally, the rights alleged to have been violated include that First Amendment right to freedom of religion, a matter of public importance.

*Id.* at 1275 (emphasis original).

¶ 12 Here, Maria's death rendered Appellant's issues technically moot. However, the issues raised by this appeal are capable of repetition given the approximately two million Jehovah's Witnesses living in the United States. *See id.* The issues in this appeal, rights to privacy and bodily integrity, are matters of public im-

portance. *Id.* Finally, the circumstantial constraints involved in appeals of this nature make timely review virtually impracticable in almost every instance. *Id.* Accordingly, we proceed to the merits of this appeal.

■ ¶ 13 Appellant next argues that the trial court violated Maria's common law and constitutional rights when it appointed an emergency guardian to consent to a blood transfusion on behalf of Maria in spite of her religious beliefs and prior directives. We agree.

■ ¶ 14 Appellant has raised both constitutional and common law challenges to the court's order. We note that courts should avoid deciding issues on constitutional grounds where the issue may be resolved on non-constitutional grounds. *Rescue Army v. Municipal Court of Los Angeles,* 331 U.S. 549, 568–569, 67 S.Ct. 1409, 91 L.Ed. 1666 (1947); *Fiori, supra; Commonwealth of Pennsylvania, Department of Transportation v. Taylor,* 746 A.2d 626, 629 (Pa.Super.2000); *Commonwealth v. Crisp,* 441 Pa.Super. 171, 657 A.2d 5, 8 (1995).

¶ 15 The right to refuse medical treatment is deeply rooted in our common law. This right to bodily integrity was recognized by the United States Supreme Court over a century ago when it proclaimed "no right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person...." *Union Pacific Railway Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734, 737 (1891).

¶ 16 The right to control the integrity of one's body spawned the doctrine of informed consent. *See Fiori, supra; Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 105 N.E. 92, 93 (1914) (Cardozo, J.). This doctrine demands that if the patient is mentally and physically able to consult about his or her condition, the patient's informed consent is a prerequisite to treatment. *Moure v. Raeuchle,* 529 Pa. 394, 404, 604 A.2d 1003, 1008 (1992). *See also Fiori, supra* at 910; *Nogowski v. Alemo–Hammad,* 456 Pa.Super. 750, 691 A.2d 950, 954 (1997), *appeal denied,* 550 Pa. 684, 704 A.2d 638 (1997).

A logical corollary to this doctrine is the patient's right, in general, to withdraw consent to treatment once begun. Courts have unanimously concluded that this right to self-determination does not cease upon the incapacitation of the individual.

*Fiori, supra.*

■ ¶ 17 While this right is fundamental to our concept of personal autonomy, it may be outweighed by any one of four state interests: 1) protection of third parties; 2) protection of the ethical integrity of the medical profession; 3) preservation of life; and 4) prevention of suicide. *Id. See also Stamford Hospital v. Vega,* 236 Conn. 646, 674 A.2d 821, 830–831 (1996); *Wons v. Public Health Trust of Dade County,* 500 So.2d 679, 684–687 (Fla.App. 3 Dist.1987), *approved by,* 541 So.2d 96 (Fla. 1989); *In the Matter of Conroy,* 98 N.J. 321, 486 A.2d 1209, 1225–1226 (1985); *Fosmire v. Nicoleau,* 75 N.Y.2d 218, 551 N.Y.S.2d 876, 551 N.E.2d 77, 80–82 (1990).

■ ¶ 18 When evaluating the state's interest in protecting third parties, "the primary focus is on whether the patient has dependents who would be left emotionally and financially bereft were the patient to refuse medical treatment." *Fiori, supra* at 910. When evaluating the state's interest in protecting the ethical integrity of the medical profession, courts should recognize that it is well within the parameters of medical ethics to abide by a patient's direction to abstain from treatment under certain circumstances. *Wons,*

*supra* at 686. "Medical ethics do not require medical intervention in disease at all costs." *Conroy, supra* at 1224. "It is not necessary to deny a right of self-determination to a patient in order to recognize the interests of doctors, hospitals, and medical personnel in attendance on the patient." *Superintendent of Belchertown State School v. Saikewicz*, 373 Mass. 728, 370 N.E.2d 417, 426–427 (1977). "Indeed, if the patient's right to informed consent is to have any meaning at all, it must be accorded respect even when it conflicts with the advice of the doctor or the values of the medical profession as a whole." *Conroy, supra* at 1225.

¶ 19 When examining the state's interest in preserving the lives of its citizens, an important distinction must be drawn between protecting the state's citizens from injuries by a third party and protecting citizens from themselves. *See Fosmire, supra* at 81. While the state has a substantial interest in protecting its citizens from each other, its interest is relatively low when the acts of one individual do not injure others or impact the public at large. *Id.* "This is consistent with the primary function of the state to preserve and promote liberty and the personal autonomy of the individual." *Id.* at 82. Finally, while the state's interest in preventing suicide is a natural corollary to its interest in preserving life, it is generally considered as a distinct state interest for purposes of balancing the state's interests with the rights of an individual to refuse medical treatment. *See Conroy, supra* at 1224. Nevertheless,

> declining life-sustaining medical treatment may not properly be viewed as an attempt to commit suicide. Refusing medical intervention merely allows the disease to take its natural course; if death were eventually to occur, it would be the result, primarily, of the underlying disease, and not the result of a self-inflicted injury. In addition, people who refuse life sustaining medical treatment may not harbor a specific intent to die, rather, they may fervently wish to live, but to do so free from unwanted medical technology...

*Id.* (internal citations omitted). "On balance, the right to self-determination ordinarily outweighs any countervailing state interests, and competent persons generally are permitted to refuse medical treatment, even at the risk of death." *Id.* at 1225.

¶ 20 The right of a Jehovah's Witness to refuse a blood transfusion was examined previously in *Dorone, supra*. In that case, a twenty-two year old Jehovah's Witness was injured in a car accident. The operation to save his life was likely to require a blood transfusion, but *Dorone's* parents refused to consent to a transfusion on the basis of the family's religious beliefs. The hospital then petitioned the court to appoint an emergency guardian to consent to the blood transfusion. The court granted the hospital's petition. It was later alleged that the decedent had signed a medic alert card explaining his religious beliefs and refusing blood transfusions. On appeal, this Court held that even if the medic alert card were produced, that evidence alone would not be sufficient to reverse the trial court's order. This Court decided that despite the medic alert card it was unclear whether *Dorone*, at the time of his operation, still held the beliefs of Jehovah's Witnesses, whether these convictions would waiver in the face of death, and the circumstances surrounding the execution of the card. This Court concluded that under those facts the trial court did not err when it appointed an emergency guardian to consent to the transfusions. *See Dorone, supra*. On appeal, the Pennsylvania Supreme Court affirmed this Court's decision, concluding that only a clear directive

from the patient to refuse medical treatment would override evidence of medical necessity. *See In Re Estate of Dorone*, 517 Pa. 3, 9, 534 A.2d 452, 455 (1987).

¶ 21 The instant case is distinguishable from *Dorone*. Here, Maria clearly indicated her resolute refusal of blood transfusions. Her DPA was unequivocal in its pointed refusal of a blood transfusion under any circumstance. Her statement that, "even if health-care providers...believe that only blood transfusion therapy will preserve my life or health, I do not want it" indicates her resolve to refuse blood under life threatening conditions. (Exception to Guardianship Order–Exhibit B, at 1). Maria also clearly indicated that her refusal of blood was an unwavering religious conviction. The fact that Maria presented the hospital staff with copies of her DPA minutes before her operation demonstrates her continued affirmation to abstain from blood. Maria's appointment of Appellant as her personal health care agent was another clear demonstration that her desire to abstain from blood be given a voice when she could not provide one.

¶ 22 There is also evidence of Maria's desire to refuse blood, independent of her DPA. The Center had performed liver transplants for Jehovah's Witnesses without the transfusion of blood. Maria specifically chose the Center to perform her operation, as it could accommodate her religious beliefs. Maria also discussed her beliefs with her husband and family prior to the liver transplant operation. Finally, she verbalized her refusal of a transfusion to the hospital staff prior to her operation. Under these facts, Maria clearly expressed her desire not to receive blood transfusion therapy. This refusal of medical treatment is protected by Pennsylvania common law. *See Fiori, supra; Vega, supra;*

*Wons, supra; Conroy, supra; Fosmire, supra.*

¶ 23 Moreover, after a careful review of the record, there is no evidence to suggest that any state interest in this case was compelling enough to override Maria's refusal of blood. *See id.* There is no evidence that the state's interest in protecting third parties is implicated here. The transcript of the hearing to appoint Lionel Duran emergency guardian is devoid of testimony regarding the emotional and financial relationship between Maria and her two teenage children. *See Fiori, supra.* Therefore, we will not manufacture evidence and conjecture in a strained attempt to apply this exception to the instant facts.

¶ 24 Additionally, abiding by Maria's competent, thoughtful, and deliberate refusal of blood is not offensive to medical ethics. *See Wons, supra; Saikewicz, supra; Conroy, supra.* It is not necessary to deny Maria's right to personal autonomy in order to recognize the interest of doctors to treat patients to the best of their ability. *See Saikewicz, supra.* In this case, therefore, the state's interest in safeguarding medical ethics is not implicated.

¶ 25 Further, Maria's refusal of blood transfusions does not injure other citizens of the state. *See Fosmire, supra.* The state's interest in preserving Maria's life must give way to Maria's liberty and autonomous decision to forego a blood transfusion that might prolong it. *See id.* Thus, the state's interest in preserving Maria's life was relatively low compared to Maria's right to personal autonomy. *See id.*

¶ 26 Finally, Maria's refusal of blood transfusion therapy is not suicide for purposes of this analysis. *See Conroy, supra.* Maria sought surgery in the hope of a longer life. Spiritual and religious consid-

erations, rather than an intent to die, motivated her refusal of blood transfusions. Thus, the state's interest in preventing suicide is not implicated here. *See id.* Accordingly, Maria's right to refuse a blood transfusion was protected by Pennsylvania common law.[3]

¶ 27 Appellant next argues that Lionel Duran should not have been appointed Maria's emergency guardian because Maria had already appointed a health care representative when she executed her DPA. Appellant also contends that Lionel Duran should not have been appointed emergency guardian for the express purpose of consenting to a blood transfusion because his beliefs conflicted with Maria's regarding blood transfusion therapy. Finally, Appellant alleges that he should not have been displaced as Maria's agent absent a showing that Appellant had acted inappropriately in his guardianship. We agree.

¶ 28 The appointment of a guardian lies within the discretion of the trial court and will be overturned only upon an abuse of discretion. *Estate of Haertsch,* 437 Pa.Super. 187, 649 A.2d 719, 720 (1994). "Discretion must be exercised on the foundation of reason. An abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 469, 756 A.2d 1116, 1123 (2000) (citations and quotations omitted).

¶ 29 Section 5513 of Title 20 of the Pennsylvania Consolidated Statutes regulates the appointment of emergency guardians. This Section provides, *inter alia,*

Notwithstanding the provisions of section 5511 (relating to petition and hearing; independent evaluation), the court, upon petition and a hearing at which clear and convincing evidence is shown, may appoint an emergency guardian or guardians of the person or estate of a person alleged to be incapacitated, when it appears that the person lacks capacity, **is in need of a guardian** and a failure to make such appointment will result in irreparable harm to the person or estate of the alleged incapacitated person.

20 Pa.C.S.A. § 5513 (emphasis added). In addition, the trial judge may only appoint a guardian who will act in the best interest of his ward. *Dorone, supra* at 454. Finally, Section 5511(f) states that "If appropriate, the court shall give preference to a nominee of the incapacitated person." 20 Pa.C.S.A. § 5511(f).

¶ 30 When a patient has executed a DPA and named a personal representative, that choice is given paramount importance. *In Re Sylvester,* 409 Pa.Super. 439, 598 A.2d 76, 83 (1991). Under these circumstances, Section 5604(c)(2), regulating durable powers of attorney, must be read in conjunction with Section 5511. *Id.* Read together, these Sections require the court to give effect to the patient's selection of a guardian, except for good cause or disqualification. *Id.*

¶ 31 In the instant case, Maria executed a valid DPA contemplating an emergency situation that might require a blood transfusion. After deliberation, Maria recorded her emphatic refusal of blood transfusion therapy under all circumstances. Maria also appointed her own health care agent to ensure that this order was obeyed. *See*

---

**3.** Due to our disposition of this issue on common law grounds, we need not address any constitutional implications. *See Rescue Army,*

*supra; Fiori, supra; Taylor, supra; Crisp, supra.*

20 Pa.C.S.A. §§ 5604(c)(2), 5511; *Sylvester, supra.* Therefore, Maria was not in need of a guardian. *See id.* When the very situation contemplated by Maria's DPA arose, the court should have given effect to Maria's unequivocal directions. *See Dorone, supra;* 20 Pa.C.S.A. § 5513. Moreover, no one alleged that Appellant had acted contrary to Maria's wishes or best interest. *See Sylvester.* Therefore, the appointment of Lionel Duran as guardian for the express purpose of consenting to a blood transfusion contradicted Maria's clear and unequivocal directions. *See id.* To hold differently would devitalize personal health care directives and devalue the common law right to personal autonomy. Accordingly, we agree with Appellant that the trial court erred when it appointed Lionel Duran as Maria's emergency guardian.

¶ 32 In his final argument, Appellant contends that Lionel Duran knew that Appellant was Maria's duly appointed health care agent. Appellant also contends that Lionel Duran knew Appellant's whereabouts at all times prior to Mr. Duran's oral motion for appointment as Maria's emergency guardian. Thus, Appellant concludes, he should have been notified of the hearing to appoint a new guardian. We agree.

¶ 33 Section 5511 provides that notice of a hearing to appoint a permanent guardian be given to the incompetent, those sharing in the incompetent's estate and other parties as the court may direct. *Sylvester, supra* at 82. This Section, when read in conjunction with Section 5604(c)(2), requires that notice of a hearing to appoint a guardian be given to the guardian named by the incompetent in her DPA. *Id.*

> Section 5513, which governs appointment of [emergency] guardians, provides that notice of the appointment of [an emergency] guardian shall be required "as shall appear to the court to be feasible in the circumstances," and notice does not have to be given to the persons required to be given notice of permanent guardianship proceedings instituted under section 5511 of the Probate Code.
>
> *Id.*

¶ 34 In the instant case, Maria's DPA named Appellant as her personal representative for health care. (Exception to Guardianship Order–Exhibit B, at 3–4). *See id.* Maria informed the doctors and hospital staff of her DPA and provided copies of this document prior to surgery. She also discussed her DPA with family members before her treatment began. During the course of Maria's treatment, doctors and staff at the Center sought Appellant's consent to a kidney dialysis, a biopsy and the second liver transplant. (Affidavit by Larry Johnson, dated August 2, 1999). When, however, a blood transfusion in contravention of Maria's DPA was required, no one looked to Appellant for consent, or informed him of a hearing to displace his guardianship. Lionel Duran and the hospital staff knew where to find Appellant in an emergency situation, as they had on the three prior emergency consent situations. Thus, it was reasonable under these circumstances to afford Appellant notice of the hearing in question. *See id.* Accordingly, Appellant was entitled to notice of the hearing.

¶ 35 It is a difficult thing to decline potentially life-saving treatment for a loved one, rendered mute by her condition, on the basis of her devotion to religious beliefs. Nevertheless, absent evidence of overarching state interests, the patient's clear and unequivocal wishes should generally be respected.

¶ 36 Based upon the foregoing analysis, we conclude that this appeal is cognizable despite its technical mootness. Additional-

ly, we hold that under the circumstances of this case, Maria's self-determination to refuse blood transfusion therapy is protected by Pennsylvania common law. The trial court abrogated Maria's right when it appointed Lionel Duran as emergency guardian, as the evidence was insufficient to implicate state interests. Finally, we conclude that Appellant, as Maria's named guardian, was entitled to notice of the hearing to appoint an emergency guardian. Thus, we reverse the trial court's order.

¶ 37 Order reversed.