J-S26033-22

2022 PA Super 163

JUDITH M. SHOEMAKER, AS POA
FOR GLEN CAUFFMAN

v.

UPMC PINNACLE HOSPITALS D/B/A
UPMC HARRISBURG AND UPMC

Appellant

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 225 MDA 2022

Appeal from the Order Entered January 26, 2022
In the Court of Common Pleas of Perry County Civil Division at No(s):
CV-2022-00042

BEFORE:   KUNSELMAN, J., McCAFFERY, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:            **FILED: SEPTEMBER 22, 2022**

UPMC Pinnacle Hospitals d/b/a UPMC Harrisburg and UPMC (collectively "UPMC") file this appeal from the order entered by the Court of Common Pleas of Perry County granting the motion for a preliminary injunction filed by Appellee, Judith M. Shoemaker, plaintiff below, as Power of Attorney for Glen Cauffman. The order specifically directed UPMC to allow two physicians, who were not credentialed at UPMC Harrisburg (the "Hospital"), to administer ivermectin to Mr. Cauffman, who had been admitted to the Hospital's Intensive Care Unit (ICU) for treatment of his COVID-19 infection after he became critically ill. After careful review, we conclude that the trial court erred in granting injunctive relief and we reverse the trial court's order.

---

[*] Former Justice specially assigned to the Superior Court.

Ivermectin is a medication used to treat certain infections caused by internal and external parasites in various animal species and humans.[1] Although ivermectin received consideration by health care experts as a potential COVID-19 treatment, the U.S. Food and Drug Administration (FDA) has not authorized the use of ivermectin to prevent or treat COVID-19 infections, warns of the drug's potential risks, and concludes that "[c]urrently available data do not show ivermectin is effective against COVID-19."[2]

The American Medical Association (AMA), American Pharmacists Association (APhA), and American Society of Health-System Pharmacists (ASHP) issued a joint statement in September 2021 "calling for the immediate end to the prescribing, dispensing, and use of ivermectin for the prevention and treatment of COVID-19 outside of a clinical trial."[3] The World Health Organization (WHO) has taken a similar position in reporting that studies evaluating ivermectin as a COVID-19 treatment are inconclusive and advising that the drug only be used in clinical trials until more data is available.[4]

---

[1] *See* Medline Plus, The National Library of Medicine, https://medlineplus.gov/druginfo/meds/a607069.html (last accessed August 30, 2022).
[2] *See* FDA website, "Why You Should Not Use Ivermectin to Treat or Prevent COVID-19," https://www.fda.gov/consumers/consumer-updates/why-you-should-not-use-ivermectin-treat-or-prevent-covid-19 (last accessed August 30, 2022).
[3] *See* AMA press release, September 1, 2021, https://www.ama-assn.org/press-center/press-releases/ama-apha-ashp-statement-ending-use-ivermectin-treat-covid-19 (last accessed August 30, 2022).
[4] *See* "WHO advises that ivermectin only be used to treat COVID-19 within clinical trials," WHO website, https://www.who.int/news-room/feature-stories/detail/who-advises-that-ivermectin-only-be-used-to-treat-covid-19-within-clinical-trials (last accessed August 30, 2022).

The factual background of the case is not disputed by the parties. On or about December 22, 2021, Mr. Cauffman, a 74-year-old male, began to develop symptoms of COVID-19. Notes of Testimony (N.T.), 1/19/22, at 13.

On January 2, 2022, after Mr. Cauffman tested positive for COVID-19 and his symptoms worsened, he was admitted to the Hospital for treatment. N.T. at 13-14; Complaint for Emergency Medical Declaratory Judgment and Emergency Injunctive Relief ("Complaint"), 1/14/22, at ¶ 10, 14. Ms. Shoemaker was authorized to act on Mr. Cauffman's behalf through a power of attorney (POA). N.T. at 10.

Mr. Cauffman was placed under the care of Dr. John Goldman, M.D., who explained the Hospital's treatment protocols for COVID-19 to Mr. Cauffman and Ms. Shoemaker. UPMC Response to Complaint, 1/19/22, at 1-2. Dr. Shoemaker also gave Mr. Cauffman and Ms. Shoemaker a pamphlet outlining the Hospital's approved COVID-19 treatment options and available clinical care. *Id.* The pamphlet also notified Mr. Cauffman and Ms. Shoemaker of the treatments the Hospital did not currently provide, which included ivermectin, as the Hospital asserted that such a treatment is "not well-studied and either show[s] no benefit or potential harm, and … may not have the proper science to support its use." *Id.*

Upon his admission to the Hospital, Mr. Cauffman received approved treatments such as Remdesivir, Dexamethasone, and monoclonal antibodies. N.T. at 15-17. Once Mr. Cauffman's condition deteriorated further, on January 9, 2022, he was administered high-flow oxygen followed by bilevel positive

airway pressure (BiPaP) and was given Lasix to decrease fluid buildup in his lungs. *Id*. at 17. On January 10, 2022, Mr. Cauffman was sedated, intubated, and placed on a ventilator in the Hospital's ICU. *Id.* at 18.

Thereafter, Ms. Shoemaker, now acting as POA, requested that the Hospital treat Mr. Cauffman's COVID-19 infection with ivermectin. On January 13, 2022, Ms. Shoemaker obtained a prescription for ivermectin from Mr. Cauffman's primary care physician, Dr. Michael Thieblemont, M.D., a family medicine physician who is licensed in Pennsylvania, but does not have credentials or privileges to practice in an intensive care unit or at the Hospital where Mr. Cauffman was being treated.

While Ms. Shoemaker acknowledged that the Hospital had not included ivermectin as an approved treatment in its COVID-19 protocol, she noted that at this point, Mr. Cauffman's chance of survival was low and the Hospital had exhausted their authorized treatment options. Complaint, at ¶ 20-22. As such, Ms. Shoemaker offered to sign a release to relieve UPMC, their agents, or any party acting on their behalf from any liability in administering the ivermectin to Mr. Cauffman. *Id*. at ¶ 18.

When the Hospital refused to administer ivermectin to Mr. Cauffman, on January 14, 2022, Ms. Shoemaker filed the Complaint, seeking a declaratory judgment compelling the Hospital to follow Dr. Thieblemont's prescription to administer ivermectin to Mr. Cauffman and to comply with the POA's directives. In addition, on the same day, Ms. Shoemaker filed an "Emergency Petition for Injunctive Relief" as well as a "TRO [Temporary Restraining

Order]/Preliminary Injunction" motion, similarly claiming that injunctive relief was necessary as there was a substantial likelihood that Mr. Cauffman would lose the chance to preserve his life if UPMC was allowed to continue to refuse to administer ivermectin.

In the Complaint, Ms. Shoemaker claimed UPMC had "without justification breached their express and/or implied contract with [Mr. Cauffman] in failing to provide proper medical care and … their collective obligation and [Hippocratic] oath to 'do no harm'" in refusing to administer ivermectin, which had been prescribed by Mr. Cauffman's primary care provider and could possibly save his life. Complaint, at ¶ 33. Ms. Shoemaker also asserted that UPMC "violated Pennsylvania and federal law by denying Mr. Cauffman his legal right to make rational treatment decisions and choices, individually and through his authorized legal representative." *Id*. at ¶ 34.

Attached to the Complaint were affidavits from Ms. Shoemaker herself, Ralph C. Lorigo, Esq. (one of Ms. Shoemaker's attorneys), and Dr. Pierre Kory, M.D., who Ms. Shoemaker identified as an expert in COVID-19 management and the use of ivermectin to treat COVID-19. The affidavits were accompanied by multiple exhibits, including Dr. Thieblemont's prescription for ivermectin.

On the same day, on January 14, 2022, the trial court granted an *ex parte* preliminary injunction, ordering that UPMC and/or their agents comply with Dr. Thieblemont's order and prescription to administer ivermectin to Mr. Cauffman. The trial court found Ms. Shoemaker was entitled to a preliminary injunction because she had a probable right to relief, Mr. Cauffman would

suffer imminent and irreparable injury if the injunction was not granted, and there will be no adequate remedy at law unless injunctive relief was granted.[5] The trial court scheduled a hearing on the request for injunctive relief to be held on January 19, 2022.

On the day of the scheduled hearing, UPMC filed a response to Ms. Shoemaker's Emergency Petition for Injunctive Relief, claiming that Ms. Shoemaker's request to compel alternative care at the Hospital did not meet the necessary requirements to warrant injunctive relief.

The trial court held the January 19, 2022 hearing via Zoom videoconference. Ms. Shoemaker testified and offered the expert testimony

---

[5] Pennsylvania Rule of Civil Procedure 1531(a) provides:

> A court shall issue a preliminary or special injunction only after written notice and hearing *unless it appears to the satisfaction of the court that immediate and irreparable injury will be sustained before notice can be given or a hearing held*, in which case the court may issue a preliminary or special injunction without a hearing or without notice. In determining whether a preliminary or special injunction should be granted and whether notice or a hearing should be required, the court may act on the basis of the averments of the pleadings or petition and may consider affidavits of parties or third persons or any other proof which the court may require.

Pa.R.C.P. 1531(a) (emphasis added). However, an *ex parte* injunction granted pursuant to Rule 1531 without notice to the defendant "shall be deemed dissolved unless a hearing on the continuance of the injunction is held within five days after the granting of the injunction or within such other time as the parties may agree or as the court upon cause shown shall direct." Pa.R.C.P. 1531(d). Further, "[a]fter a preliminary hearing, the court shall make an order dissolving, continuing or modifying the injunction." Pa.R.C.P. 1531(e).

of Dr. Daniel Wheeler, D.O., an emergency room physician with fifteen years of experience. N.T. at 43. While Dr. Wheeler is licensed to practice medicine in Pennsylvania, he admitted he did not have privileges to practice in any intensive care unit nor was he credentialed at the Hospital. *Id*. at 44, 54.

Dr. Wheeler testified that ivermectin would be an appropriate prescription for Mr. Cauffman and testified that it is common for physicians to prescribe medication for an off-label use. *Id*. at 44-45. Dr. Wheeler indicated there have been studies showing ivermectin has benefited COVID-19 patients in multiple areas, namely ICU admission, hospitalization, and preventing death. *Id*. at 45. However, Dr. Wheeler agreed that the prevailing hospital standard of care does not use ivermectin to treat COVID-19. *Id*. at 54.

Dr. Wheeler indicated that in the two days that Mr. Cauffman's condition showed slight improvement in his blood gas data since receiving his first dose on January 16, 2022. *Id*. at 47-48. Dr. Wheeler attributed this improvement to the ivermectin. *Id*. at 49.

UPMC offered the testimony of Dr. Goldman, the Chair of UPMC's Infectious Control committee, the system epidemiologist, and the infectious disease consultant directly involved in Mr. Cauffman's care. Dr. Goldman indicated that UPMC's protocol for COVID-19 was in accordance with national organizations such as the CDC and the Infectious Disease Society of America in concluding ivermectin was not effective in treating COVID-19. *Id*. at 66.

Dr. Goldman contested Dr. Wheeler's suggestion that Mr. Cauffman's condition was improving after receiving the ivermectin, as Mr. Cauffman's lung

function had not changed. *Id*. at 74. While Dr. Goldman admitted that at times Mr. Cauffman's need for oxygenation lowered, Dr. Goldman attributed this slight improvement to the adjustment of Mr. Cauffman's body position to a prone position on his stomach. Dr. Goldman noted Mr. Cauffman's need for oxygenation increased when he was placed on his back. *Id*.

UPMC also presented the testimony of Erik Hernandez, the director of clinical pharmacy services for UPMC's facilities in central Pennsylvania. Mr. Hernandez serves as a member of the UPMC Covid Therapeutics Committee, in which he reviewed medical literature relating to the use of ivermectin to treat COVID-19. *Id*. at 103-105. Both Dr. Goldman and Mr. Hernandez criticized the study relied upon by Dr. Wheeler, claiming this article was retracted after subsequent peer review revealed that it had relied on data which had been suspected as having been falsified. *Id*. at 64-65, 105-106.

On January 26, 2022, the trial court entered an order granting Ms. Shoemaker's motion for a preliminary injunction and directing the Hospital to allow Dr. Thieblemont, Dr. Wheeler, or a nurse acting at their direction, to administer ivermectin to Mr. Cauffman at the Hospital pursuant to Dr. Thieblemont's prescription. The trial court also directed Dr. Thieblemont and Dr. Wheeler to make themselves "reasonably available to hospital staff for continued consultation on the necessity to continue administration of ivermectin." Order, 1/26/22, at 1.

On January 31, 2022, UPMC filed a notice of appeal along with an Emergency Motion to stay the Preliminary Injunction pending Appeal with the

trial court. After the trial court did not act on this motion, on February 10, 2022, UPMC filed an Emergency Motion to Stay Preliminary Injunction Pending Appeal before this Court. Attached to this motion was an affidavit from Dr. Goldman, who indicated that the Hospital was directed to give Mr. Cauffman 60 mg of ivermectin a day, which he stated was 2-3 times the normal amount of ivermectin used for its typical purpose as an antiparasitic medication. Goldman affidavit, 2/10/22, at 1.

Dr. Goldman reported that the ivermectin did not cause any discernable improvement in Mr. Cauffman's condition as his oxygen requirements had not decreased, his lung function failed to improve, he still required a ventilator, and needed to undergo a tracheostomy to support long term ventilator use. *Id*. at 1-2.

Dr. Goldman reported that while Mr. Cauffman's liver function tests were initially normal, his "liver function tests increased to approximately ten times the normal levels" after Mr. Cauffman received ivermectin at a higher dose and for a longer duration than normally given to treat parasitic illnesses. *Id*. As Dr. Goldman was aware that ivermectin has been reported to cause liver damage, he opined that the damage to Mr. Cauffman's liver was likely caused by the ivermectin. *Id*. at 2.

On February 10, 2022, this Court entered a *per curiam* order granting UPMC's Emergency Motion to Stay Preliminary Injunction Pending Appeal. However, this Court was subsequently notified that Mr. Cauffman passed away on February 22, 2022.

After learning of Mr. Cauffman's passing, this Court issued a Rule to Show Cause on March 9, 2022, directing UPMC to show why the appeal should not be dismissed as moot. Order, 3/9/22, at 1 (citing **Delaware River Preservation Co., Inc. v. Miskin**, 923 A.2d 1177, 1183, n.3 (Pa.Super. 2007) (emphasizing that where controversy no longer exists, appeal will be dismissed as moot)).

In its response to the Rule to Show Cause, UPMC concedes that the appeal is technically moot, but asks this Court to review the merits of the case which UPMC claims involves an issue of public importance, which is capable of repetition but apt to elude appellate review.

Before reaching the merits of the appeal, we must evaluate whether our review of this matter is appropriate. We are guided by the following principles:

> Generally, an actual claim or controversy must be present at all stages of the judicial process for the case to be actionable or reviewable. **Plowman v. Plowman**, 409 Pa.Super. 143, 597 A.2d 701, 705 (1991). If events occur to eliminate the claim or controversy at any stage in the process, the case becomes moot. **Id**. Even if a claim becomes moot, we may still reach its merits if the issues raised in the case are capable of repetition, yet likely to continually evade appellate review. **Id**. **See also In Re Fiori**, 543 Pa. 592, 600 n. 4, 673 A.2d 905, 909 n. 4 (1996) (holding death of patient did not preclude appellate review where issue was of important public interest, capable of repetition, yet apt to elude appellate review); **Commonwealth v. Bernhardt**, 359 Pa.Super. 413, 519 A.2d 417, 420 (1986) (holding exception to mootness doctrine exists where "(1) the question involved is capable of repetition but likely to evade review, or (2) the question involved is one of public importance"). Therefore, if the issues raised by an appeal are "substantial questions" or "questions of public importance," and are capable of repetition, yet likely to evade appellate review, then we will reach the merits of the appeal despite its technical mootness.

- 10 -

*In re Duran*, 769 A.2d 497, 502 (Pa.Super. 2001).

In *In re Duran*, this Court reviewed a challenge to an order appointing an emergency guardian who consented to a blood transfusion that the patient, a Jehovah's Witness, had refused based on her religious beliefs. Although the patient's death rendered the appeal technically moot, this Court found the issue raised in the appeal was capable of repetition due to the large class of Jehovah's Witnesses in the population. *Id*. This Court determined that the issues in the appeal involving the patient's right to privacy and bodily integrity were matters of public importance. *Id*. at 502-503. Lastly, this Court noted that the issue raised was capable of evading review because an emergency blood transfusion involves time constraints that would make appellate review "virtually impracticable." *Id*. at 503. As such, this Court concluded the issue raised in that case was cognizable despite its technical mootness.

Applying these principles in this case, we acknowledge that Mr. Cauffman's death rendered this appeal technically moot. However, we agree with UPMC that the issues in this appeal are capable of repetition given the ongoing COVID-19 pandemic. We also agree with UPMC this appeal involves a broad range of public policy issues involving the standard of care, ethical concerns of healthcare providers, and whether a court may direct a hospital to administer a certain treatment or to allow the administration of a certain treatment against hospital protocol, overriding the advice of medical professionals and hospital accreditation standards.

Moreover, the decision of whether a patient is entitled to compel a hospital to administer ivermectin to treat severe COVID-19 infections or allow an uncredentialed physician to administer this treatment will evade appellate review as the matter would likely be resolved via the patient's recovery or death before the completion of the appellate process. Thus, we find the appeal raises a cognizable issue despite its technical mootness.

UPMC raises the following issue for our review on appeal:

Whether the Trial court erred in entering an injunction compelling a hospital to permit an uncredentialed physician to administer substandard care where [Ms. Shoemaker] did not meet her burden to establish each of the essential prerequisites for the preliminary injunctive relief?

UPMC's Brief, at 4. The Hospital and Healthsystem Association of Pennsylvania filed an *amicus curiae* brief in support of UPMC's position.

We begin by noting that in this case, the trial court granted a *mandatory* preliminary injunction as it compelled UPMC to perform a positive act to maintain the status quo of the parties when it first required UPMC to administer ivermectin to Mr. Cauffman and then astonishingly compelled UPMC to allow uncredentialed physicians to practice medicine at the Hospital in administering ivermectin to Mr. Cauffman outside of the Hospital's COVID-19 treatment protocol. ***See Mazzie v. Commonwealth***, 495 Pa. 128, 134, 432 A.2d 985, 988 (1981) (distinguishing between mandatory and prohibitory preliminary injunctions).

As a general rule, appellate review of the grant or denial of a preliminary injunction is "limited to a determination of whether an examination of the

record reveals that any apparently reasonable grounds support the trial court's disposition of the preliminary injunction request." ***Summit Towne Centre, Inc.***, 573 Pa. 637, 646, 828 A.2d 995, 1001 (2003) (internal quotation marks and citation omitted).

However, our appellate courts deviate from the general standard of review in cases where the trial court has granted a mandatory preliminary injunction, which is an extraordinary remedy that should only be utilized in the rarest of circumstances. ***See id***. at 646, 828 A.2d at 1001, n.7; ***id***. at 653, 828 A.2d at 1005, n.13. Our Supreme Court has adopted a unique standard of review for appeals from the grant of mandatory preliminary injunctions as follows:

> Generally, preliminary injunctions are preventive in nature and are designed to maintain the status quo until the rights of the parties are finally determined. There is, however, a distinction between mandatory injunctions, which command the performance of some positive act to preserve the status quo, and prohibitory injunctions, which enjoin the doing of an act that will change the status quo. This Court has engaged in greater scrutiny of mandatory injunctions and has often stated that they should be issued more sparingly than injunctions that are merely prohibitory. Thus, in reviewing the grant of a mandatory injunction, we have insisted that a clear right to relief in the plaintiff be established.

***Mazzie***, 495 Pa. at 134, 432 A.2d at 988 (citations omitted). As a result, in reviewing the trial court's decision to grant a mandatory injunction, we must "examine the merits of the controversy and ensure that 'a clear right to relief in the plaintiff is established.'" ***Greenmoor, Inc. v. Burchick Const. Co.***, 908 A.2d 310, 313 (Pa.Super. 2006) (citations omitted).

In order to obtain a preliminary injunction, a petitioner must demonstrate six essential prerequisites:

> First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity. Sixth, and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

*Summit Towne Centre*, 573 Pa. at 646, 828 A.2d at 1001 (internal citations omitted). If a petitioner fails to establish any one of the six prerequisites, a reviewing court need not address the remaining prongs. *Id.*

In the instant case, UPMC focuses on the fourth prong and argues that Ms. Shoemaker failed to show "the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or… that it is likely to prevail on the merits." *Id*. We agree.

In assessing whether injunctive relief was proper, the trial court purported to have the authority to resolve the factual dispute of whether ivermectin has potential benefits in treating COVID-19 patients. The trial court considered the testimony of the parties' experts and determined that

Ms. Shoemaker's experts testified credibly in claiming that Mr. Cauffman's condition improved after receiving the ivermectin. As such, the trial court found Ms. Shoemaker was likely to prevail on the merits of her challenge as there seemed to be evidence that ivermectin benefited Mr. Cauffman.

In conducting this analysis, the trial court's focus was misplaced as the trial court failed to recognize that the question before it was not whether ivermectin is a suitable treatment option for COVID-19, but rather whether Ms. Shoemaker had identified a *legal right* in need of protection through a mandatory injunction. More specifically, the trial court failed to evaluate whether Ms. Shoemaker established that Mr. Cauffman had the legal right to compel UPMC to administer a certain treatment that contravened its own hospital policy or to allow an uncredentialed physician to practice on its premises in violation of the hospital's protocols.

In her complaint, Ms. Shoemaker alleged that the Hospital breached their "express and/or implied contract with Mr. Cauffman in failing to provide proper medical care" and suggested that the Hospital had violated the Hippocratic oath to "do no harm" in refusing to administer ivermectin to Mr. Cauffman in an attempt to save his life. Complaint, at ¶ 33.

We first note that the record does not contain any evidence of an express contract signed by Mr. Cauffman or hospital staff that would entitle Ms. Cauffman to injunctive relief.

Second, any implied contract between Mr. Cauffman and the Hospital would simply require the Hospital to treat Mr. Cauffman according to the

applicable standard of care. In addition, Ms. Shoemaker's allegation that the Hospital violated the Hippocratic oath to "do no harm" is simply a reformulation of its duty to comply with the relevant standard of care, not an excuse to force a hospital to abandon its protocols as well as to require an uncredentialed physician to practice on its premises.

Our Supreme Court has recognized that a hospital may be held directly liable for corporate negligence if it fails to "uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital." ***Thompson v. Nason Hosp.***, 527 Pa. 330, 339, 591 A.2d 703, 707 (1991). Our courts have provided that the doctrine of corporate negligence requires hospitals to uphold the following four duties:

> 1. a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;
>
> 2. a duty to select and retain only competent physicians;
>
> 3. a duty to oversee all persons who practice medicine within its walls as to patient care; and
>
> 4. a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for the patients.

***Whittington v. Episcopal Hosp.***, 768 A.2d 1144, 1149 (Pa.Super. 2001) (quoting ***Thompson***, 527 Pa. at 339-40, 591 A.2d at 707–708). Further, "to successfully present a *prima facie* case of corporate negligence, a petitioner must introduce evidence of the following:

> 1. appellant acted in deviation from the standard of care;
>
> 2. appellant had actual or constructive notice of the defects or procedures which created the harm; and

3. that the conduct was a substantial factor in bringing about the harm.

***Whittington***, 768 A.2d at 1149 (citing ***Welsh v. Bulger****,* 548 Pa. 504, 513-14, 698 A.2d 581, 585-86 (1997)).

However, in this case, both Ms. Shoemaker and her expert witness, Dr. Wheeler admit the use of ivermectin to treat COVID-19 patients is outside the Hospital's standard of care. N.T. at 31-33, 54. As noted above, multiple national health organizations, including the FDA, AMA, and WHO, have advocated against the use of ivermectin to treat COVID-19 based on the absence of conclusive studies to show ivermectin is effective at treating COVID-19.

While Ms. Shoemaker also asserted that UPMC "violated Pennsylvania and federal law by denying Mr. Cauffman his legal right to make rational treatment decisions and choices," Ms. Shoemaker failed to cite to any legal authority to support these allegations.

There is no precedent or applicable law to support the proposition that a patient has a legal right to demand a particular medical treatment against the advice of their treating physicians, to compel a hospital to allow the administration of a medical treatment that contravenes its own hospital policy, or to force a hospital to issue credentials to a physician to administer such a treatment.

Our review of applicable regulations reveals that Section 102.33 of the Health and Safety Code does provide that a hospital "shall establish a Patient's Bill of Rights," which must include the following relevant provisions:

(5) A patient has the right to know what hospital rules and regulations apply to his conduct as a patient.

(6) The patient has the right to expect emergency procedures to be implemented without unnecessary delay.

(7) The patient has the right to good quality care and high professional standards that are continually maintained and reviewed.

(8) The patient has the right to full information in layman's terms, concerning his diagnosis, treatment, and prognosis, including information about alternative treatments and possible complications. When it is not medically advisable to give such information to the patient, the information shall be given on his behalf to the patient's next of kin or other appropriate person.

\*\*\*

(11) A patient has the *right to refuse any drugs, treatment, or procedure offered by the hospital*, to the extent permitted by law, and a physician shall inform the patient of the medical consequences of the patient's refusal of any drugs, treatment, or procedure.

28 Pa. Code § 103.22(b)(5)-(8), (11) (emphasis added).

While this regulation provides that a patient has the right to full information about his diagnosis, treatment, and prognosis as well as the right to refuse treatment, notably absent from this regulation is any language granting a patient the right to demand a particular treatment or therapy, especially one against hospital protocol and outside the standard of care.

Similarly, federal regulations require that hospitals, in order to participate in Medicare, must "protect and promote" certain rights of patients, such as the rights to "participate in the development and implementation of his or her plan of care," "make informed decisions regarding his or her care," and being "able to request or refuse treatment." 42 C.F.R. 482.13. However,

these federal regulations expressly provide that "[t]his right must not be construed as a mechanism to demand the provision of treatment or services deemed medically unnecessary or inappropriate." *Id*. § 482.13(b)(2).

We also emphasize that the trial court failed to cite to any legal basis to justify its decision to order UPMC to grant credentials to physicians to administer ivermectin to Mr. Cauffman within the Hospital's ICU against hospital protocol. As noted above, a hospital has a duty to select and retain only competent physicians as well as a duty to oversee all persons who practice medicine on its premises. ***Thompson***, ***supra***; ***Whittington***, ***supra***. Our Supreme Court has explained the how a hospital utilizes peer review committees in order to grant credentials to physicians to allow them to practice within the hospital:

> [p]eer review can best be understood if one realizes that in most cases doctors with hospital privileges are not employees of the hospital, instead, they are independent contractors who must be granted permission to admit patients and make use of the hospital's resources. Timothy Stoltzfus Jost, *The Necessary and Proper Role of Regulation to Assure the Quality of Health Care,* 25 Hous.L.Rev. 525, 553 (1988). A physician receives permission to use the hospital when he receives a vote of approval from his colleagues. Peer review is the common method for exercising self regulatory competence and evaluating physicians for privileges. M. Bertolet, *Hospital Liability Law and Practice* 41 (5th ed. 1987). The purpose of this privilege system is to improve the quality of health care, and reflects a widespread belief that the medical profession is best qualified to police its own. Thus, it is beyond question that peer review committees play a critical role in the effort to maintain high professional standards in the medical practice.

*Cooper v. Delaware Valley Med. Ctr.,* 539 Pa. 620, 628, 654 A.2d 547, 551 (1995).

Given the importance of the credentialing process, the trial court improperly interfered with the Hospital's discretion to select, retain, and supervise the physicians who practiced on its premises when it ordered the Hospital to allow uncredentialed physicians to administer ivermectin within the Hospital's ICU. Hospitals, not courts, have the resources and authority to determine whether a physician has the appropriate medical training, experience, and personal fitness to be eligible for medical staff privileges, especially within an intensive care unit.

Consequently, there is no support for the trial court's conclusion that injunctive relief was appropriate when Ms. Shoemaker did not have the legal right to either force the Hospital to administer ivermectin against the advice of his treating physicians and UPMC's treatment protocol or to demand that UPMC grant ICU privileges to unvetted physicians in order to administer this treatment on its premises.[6]

_____

[6] We also note that Ms. Shoemaker's willingness to sign a waiver of liability as the POA for Mr. Cauffman has no impact on our decision. The hospital was free to accept or reject Ms. Shoemaker's offer to release the hospital from liability associated with experimental treatment, and here, the hospital rejected the offer.

We note that acceptance of a waiver may have released the hospital from any of Mr. Cauffman's claims associated with the treatment. However, the law is unsettled as to whether such a waiver also would have released any claims Mr. Cauffman's heirs may have had against the hospital upon Mr. Cauffman's death after he had been administered the ivermectin for an off-

*(Footnote Continued Next Page)*

Our decision is in accord with other state appellate court decisions that have held that there is no legal authority to compel a healthcare provider to administer a treatment contrary to the provider's professional judgment and outside the standard of care. *See Gahl on behalf of Zingsheim v. Aurora Health Care, Inc.*, 977 N.W.2d 756, 759 (Wis.App. 2022) (vacating circuit court's order granting injunction that compelled health care provider to administer ivermectin to treat COVID-19 patient or to credential a provider to give the treatment); *Pisano v. Mayo Clinic Fla.*, 333 So.3d 782 (Fla. 1st DCA 2022) (affirming trial court's order denying injunctive relief as petitioners failed to demonstrate a legal basis to compel the hospital to administer ivermectin to treat COVID-19 patient against their medical judgment or ethics); *Abbinanti v. Presence Cent. & Suburban Hosps. Network*, ___N.E.3d.___, 2021 WL 6137882 (Ill.App. 2021) (affirming trial court's denial of injunctive relief as plaintiffs failed to prove they had legal basis to force hospital to allow administration of ivermectin against hospital policy); *Texas Health Huguley, Inc. v. Jones*, 637 S.W.3d 202, 207 (Tex.App.-Ft.Worth 2021) (vacating trial court's temporary injunction ordering hospital to grant physician temporary hospital privileges for the sole purpose of administering ivermectin to COVID-19 patient). *See also DeMarco v.*

_____

label use. *See Valentino v. Philadelphia Triathlon, LLC*, 653 Pa. 231, 209 A.3d 941 (2017) (an equally divided Supreme Court affirmed the dismissal of the heirs' wrongful death claim, but failed to reach a majority decision regarding whether a release of liability would bind non-signatories to the waiver agreement). The hospital could not be compelled to enter a waiver of liability agreement.

***Christiana Care Health Servs., Inc.,*** 263 A.3d 423, 426 (Del.Ch. 2021) (court of chancery concluding that "[t]he patient has this Court's sincerest sympathies and best wishes, but not an injunction" to force hospital to administer ivermectin as "[p]atients, even gravely ill ones, do not have a right to a particular treatment").

As the appellate court in ***Huguley*** aptly noted, "judges are not doctors" and "cannot practice medicine from the bench." 637 S.W.3d at 207. "The judiciary is called upon to serve in black robes, not white coats. And it must be vigilant to stay in its lane and remember its role. Even if we disagree with a hospital's decision, we cannot interfere with its lawful exercise of discretion without a valid legal basis." ***Id.***

For the foregoing reasons, the trial court erred in granting Ms. Shoemaker's request for a mandatory injunction when she failed to meet her burden of establishing that she had a clear right to injunctive relief.

Order reversed. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 09/22/2022