598 A.2d 76

## In re Dr. Hans M. SYLVESTER
### Dr. Hans M. Sylvester, Marjorie Szerlip.

### Appeal of William B. BIRCH and Violet Fagerstrom.

Superior Court of Pennsylvania.

Argued Aug. 15, 1991.
Decided Oct. 23, 1991.

Cletus P. Lyman, Philadelphia, for appellants.

Robert M. Diorio, Media, for Szerlip, appellee.

Before ROWLEY, President Judge, and BECK and HESTER, JJ.

HESTER, Judge:

This appeal involves the propriety of guardianship proceedings conducted in the Orphans' Court Division of the Court of Common Pleas of Delaware County. We conclude that the orphans' court erred by ignoring the dictates of 20 Pa.C.S. § 5604(c)(2), which provides that a principal executing a power of attorney may nominate the guardian of his estate and that the court "shall" appoint the person so nominated as guardian of the estate except for "good cause or disqualification." Accordingly, we reverse the October 30, 1990 decree appointing Joseph E. Lastowka, Jr., Esquire, guardian of the estate and person of Dr. Hans M. Sylvester, an incompetent, and remand for a hearing consistent with this adjudication.

The record establishes the following.[1] Appellee, County of Delaware Services for the Aging, instituted this action on September 10, 1990, by filing a petition for the appointment of a temporary guardian of both the person and estate of Dr. Hans M. Sylvester. The allegations in the petition are as follows. Dr. Sylvester is a ninety-five-year-old resident of a nursing home in Bryn Mawr. Due to infirmities of old age, he is unable to manage his property or affairs and is liable to dissipate it and/or become the victim of designing persons.

William Birch and Violet Fagerstrom, appellants, were named by Dr. Sylvester as his attorneys-in-fact in an instru-

---

1. As the issues in this case relate to the procedural propriety of the proceedings and to whether appellants should have been appointed as guardians, we will not examine in detail the medical evidence relating to Dr. Sylvester's mental condition. It is clear that the orphans' court determination that the doctor is incompetent is supported by the medical evidence.

ment executed on March 12, 1990, and recorded on June 29, 1990, in the Orphans' Court Division of the Court Of Common Pleas of Philadelphia County. They also are the executors named in his will. The attorneys-in-fact, it is alleged, attempted to "isolate" Dr. Sylvester by instructing nursing home personnel not to allow friends to visit him. Reproduced record ("R.R.") at 3a. Dr. Sylvester has asked to return to his home, but appellants listed his home for sale.

On August 31, 1990, Doctor Irving S. Wiesner examined the alleged incompetent; a copy of his report is attached to the petition. The report indicates that Dr. Sylvester practiced medicine in Philadelphia until a year prior to institution of the proceedings. He recently fell, injuring his shoulder. This resulted in the nursing home placement. The report also indicates that there "has been some question recently on the improper activity on the part of his former secretary [appellant, Mrs. Fagerstrom,] and a man named [appellant, Mr. Birch,] with whom Dr. Sylvester has had dealings concerning the purchase of art works. Friends of his have complained that he has been hidden from them and the nursing home was given a list of people who could not visit him." Id. at 6a. The report further states that "Dr. Sylvester's home has been put up for sale without his knowledge, and there is suspicion that sums of money have been possibly misused." Id.

Dr. Sylvester told Dr. Wiesner that "[Ms. Fagerstrom] had been very upset about not being mentioned in his will and that he had set up another will approximately five years ago. He is confused as to when power of attorney was given and thinks that it was at the time of the rewriting of the will." Id. at 7a. In addition, Dr. Sylvester stated that Mr. Birch was his enemy and " 'has gotten hold of my secretary. I have quite a bit of money. I noticed he was acting as if [he was] maneuvering himself into position to get that money.' " Id. In Dr. Wiesner's opinion, the alleged incompetent already was the victim of designing

persons, and he strongly recommended the appointment of a temporary guardian.

A certified copy of the power of attorney executed by Dr. Sylvester is in the record.[2] It was executed six months prior to the institution of the guardianship proceedings. The document is a durable power of attorney and in it, Dr. Sylvester nominates "VIOLET FAGERSTROM and WILLIAM B. BIRCH, to be my legal guardians, for consideration by the court in any guardianship proceedings." R.R. at 21a.

Without notice, the orphans' court issued an order on September 10, 1990, appointing an independent party as temporary guardian for the person and the estate of Dr. Sylvester. On October 8, 1990, appellee filed a petition to adjudicate Dr. Sylvester an incompetent and to appoint a permanent guardian for his estate and person. That same day, the orphans' court issued a citation for rule to show cause why the doctor should not be adjudicated incompetent and scheduled a hearing on the rule for October 30, 1990. The order directed that notice of the hearing be given to Dr. Sylvester only. This petition contains the following additional allegations relating to appellants. The durable power of attorney was executed when Dr. Sylvester was hospitalized at Germantown Hospital due to injuries suffered in the fall. Appellant Fagerstrom is a "long-time" bookkeeper for the doctor. *Id.* at 12a. Appellant Birch's relationship to the doctor is "unknown at this time but it is believed Mr. Birch was a former patient of Dr. Sylvester before Mr. Birch moved to Aetna, New Hampshire ..." *Id.* at 13a. Within the past two weeks, "it is believed that [appellants] have sold some of Dr. Sylvester's personal belongings, which include substantially valued antique furniture and expensive paintings." *Id.* The temporary guardian informed appellants of the proceedings, and they gave him assurances that they would cooperate and provide any relevant financial information. The temporary guardian also spoke with counsel for appellants, and counsel stated

2. There are no allegations that the power is invalid.

that his clients will provide "any and all" necessary financial information. *Id.* at 16a.

Appellants filed preliminary objections to the petition seeking appointment of a permanent guardian, contending that the proceedings should have been instituted in Philadelphia County, where Dr. Sylvester resided prior to moving to the nursing home. The preliminary objections also indicate that appellants were appointed as executors of the doctor's will and as testamentary co-trustees of a trust created in the will. The will is dated October 30, 1988.

The following occurred at the hearing held on October 30, 1990. The orphans' court first dismissed the objections to jurisdiction. Then, an attorney for Catherine Merkle entered his appearance before the court. Ms. Merkle asked to be considered as guardian, but the orphans' court summarily dismissed her request. Dr. Wiesner testified as to Dr. Sylvester's mental condition. Appellee rested, making no attempt to prove the allegations of wrongdoing against appellants.

The orphans' court then refused to take any further testimony. Appellants first attempted to introduce depositions that they took between the time that they were notified of the incompetency proceedings by the temporary guardian and the hearing, a period of six days. They notified appellee by FAX that they wanted to depose three physicians, including the doctor's personal physician. Appellee objected to introduction of this evidence by appellants on grounds that it had not been timely notified of the depositions; the orphans' court sustained the objection.

Next, appellants, who were both present, asked to testify in order to answer the allegations of breach of confidence contained in the petitions and to enable the orphans' court to consider appointing them as guardians, in accordance with the instructions in the power of attorney. The orphans' court admitted appellants' affidavits into evidence as offers of proof as to their proposed testimony, but it refused to allow them to testify. The court then summarily appointed an independent guardian. No testimony was

taken as to the allegations of impropriety on the part of the appellants. This appeal followed entry of the final decree dismissing appellants' exceptions to the decree appointing a permanent guardian of Dr. Sylvester's estate.

We now will examine what evidence would have been presented by the affidavits and depositions that the orphans' court refused to consider in making its guardianship appointment. In the 1930s, Dr. Sylvester moved from Germany to Philadelphia, where he lived and practiced medicine for approximately 60 years. He never married. Ms. Fagerstrom was introduced to the doctor in 1972 or 1973, when she became his bookkeeper. She remained in that position until 1990. She would write his checks, maintain account registers, record interest on investments, complete medicare forms, and draft letters. On May 3, 1978, Dr. Sylvester executed a will naming Ms. Fagerstrom co-executor of his estate.

Mr. Birch first met Dr. Sylvester in late 1978 or early 1979, as a patient, and the two became friends. Mr. Birch and his family went with Dr. Sylvester to church occasionally and for picnics on property that Dr. Sylvester owned in the Poconos. Mr. Birch dined with Dr. Sylvester several times each month from 1978 to 1986, when Mr. Birch moved to New Hampshire. Since 1986, Mr. Birch has visited with Dr. Sylvester in Philadelphia approximately every two months. Dr. Sylvester was also the treating physician for Mr. Birch's wife and three children. Dr. Sylvester first asked Mr. Birch to be an executor of his estate in 1986.

In early October, 1988, Dr. Sylvester fell down the staircase in his house, and on October 9, 1988, he was admitted to Germantown Hospital. While there, Dr. Sylvester was under the supervision of Wallace G. McCune, M.D., who had been Dr. Sylvester's physician since January 17, 1985. On October 30, 1988, while Dr. Sylvester was still in the hospital, he executed a will naming Ms. Fagerstrom and Mr. Birch as co-executors of his estate. After Dr. Sylvester's fall and his return home, Ms. Fagerstrom began to handle

all of his affairs. Dr. Sylvester recuperated from his fall and returned to practicing medicine.

On March 5, 1990, Dr. Sylvester was admitted to Germantown Hospital for prostate surgery and heart problems. After the operation, appellants discussed Dr. Sylvester's condition and concluded that he needed aid in managing his affairs. They discussed a power of attorney with Dr. McCune, who concurred that Dr. Sylvester should execute a power. Both Ms. Fagerstrom and Dr. McCune discussed a power with Dr. Sylvester, and on March 12, 1990, Dr. Sylvester executed the power of attorney in the presence of Ms. Fagerstrom, Kathleen Merkle,[3] Anneliese Pfeiffer, who is Dr. Sylvester's housekeeper, and a notary public.

Kathleen Merkle, who appeared at the incompetency hearing and asked to be appointed guardian, and her husband, William, own a health food store near Dr. Sylvester's house. While Dr. Sylvester was in the hospital, Mrs. Merkle told Ms. Fagerstrom that one of the doctor's patients needed medicine from the doctor's office. Mrs. Merkle said she wanted the medicine and a syringe in order to administer the medicine. Mrs. Merkle is not a doctor but insisted that she was capable of administering the medicine. Ms. Fagerstrom refused her entry to Dr. Sylvester's office. Mrs. Merkle then asked Mr. Birch if she could get the medicine and syringe from Dr. Sylvester's office, but he also refused.

On March 17, 1990, Dr. McCune discharged Dr. Sylvester to his home on the condition that he receive continual nursing assistance. Some of the doctor's old patients then started to visit him. Despite Dr. McCune's advice to stop practicing medicine, Dr. Sylvester continued to prescribe medication for those patients. He would send Mrs. Pfeiffer to the drugstore for the medication and then direct her to deliver it.

3. At the incompetency hearing, Mrs. Merkle's attorney gave her first name as Catherine; however, the affidavits submitted by appellants state that her name is Kathleen.

In April, 1990, problems arose with Mrs. Merkle. Mrs. Fagerstrom learned from a nurse caring for the doctor that Mrs. Merkle was a regular visitor and that she insisted upon preparing Dr. Sylvester's food. The nurse also told Ms. Fagerstrom that Mrs. Merkle was ordering the nurses around, antagonizing them, and constantly interfering with their care of Dr. Sylvester. One nurse resigned due to Mrs. Merkle. Mrs. Merkle also attempted to charge $200 a week for her services, which appellants refused to pay after initially paying for three weeks.

Care of Dr. Sylvester also was disrupted by a constant flow of visitors into his house. Many people had keys to the house, including the Merkles, and other people who appellants did not know. Appellants changed the locks on the doors to Dr. Sylvester's house. The Merkles were upset that they did not have keys to the house and became abusive by ringing the doorbell and yelling at the nurses, even when Dr. Sylvester was asleep.

Appellants also began to experience problems with Ms. Pfeiffer, who was then eighty-six. On one occasion, she gave the doctor medication prescribed to treat a heart beat irregularity, even though he had been given his dosage for the day. She then left the open vial of pills near Dr. Sylvester's bedside. When a nurse came in to check his blood pressure, the overdose had affected it significantly. Ms. Pfeiffer also was frequently confused and disoriented. Appellants asked her to retire.

Following his prostate surgery, Dr. Sylvester initially made progress physically, and he was mentally alert. However, in early June, Dr. Sylvester's mind began to deteriorate. Mr. Birch noticed a distinct change in Dr. Sylvester. He was always in bed, seemed disoriented, and his actions were bizarre. On two occasions, Dr. Sylvester left his home in the middle of the night. The first time, he was found sitting on the pavement near his house by two men, who brought him home. The second time, police were involved.

Appellants began to discuss entry into a convalescent home with Dr. Sylvester, who said he would be willing to

go. Dr. McCune also came to believe that a nursing home was an appropriate facility due to Dr. Sylvester's deteriorating condition. Appellants then asked Dr. O. Spurgeon English to examine Dr. Sylvester. Dr. English interviewed Dr. Sylvester for approximately six hours during three visits on June 18, June 21, and June 30, 1990. On the first visit, Dr. English conducted memory tests and determined that Dr. Sylvester's memory was impaired substantially, although he was not then suffering from paranoid delusions that may accompany senile dementia. The doctor did express some suspicions toward Mr. Birch but refused to elaborate on them.

Dr. Sylvester thought that he was still in the hospital during all three of Dr. English's visits. Dr. English concluded that Dr. Sylvester should no longer practice medicine. Dr. English also felt that Dr. Sylvester's condition had deteriorated over the course of the three visits since his memory loss was more pronounced and since he voiced suspicions about someone tampering with his estate by the June 30th visit. Although Dr. Sylvester initially was reluctant to leave his home, Dr. English felt that he may fall there and recommended that he move to a nursing home. On July 16, 1990, Dr. Sylvester entered Bryn Mawr Terrace Nursing home in Delaware County.

Problems continued once Dr. Sylvester entered Bryn Mawr Terrace. Ms. Pfeiffer insisted that she was taking Dr. Sylvester home with her. On at least four occasions, Ms. Pfeiffer was escorting Dr. Sylvester down the hallway to her house when intercepted by nursing home personnel. Other people, including the Merkles and former patients, also told staff that they intended to remove Dr. Sylvester from Bryn Mawr Terrace. Appellants then instructed nursing home staff to prevent these people from seeing Dr. Sylvester. These proceedings were instituted soon thereafter.

■ We now consider the legal issues raised in this appeal. Appellants first suggest that the Orphans' Court of Delaware County lacked jurisdiction over the incompe-

tent because at the time proceedings were instituted, he remained domiciled in his home in Philadelphia. *See* 20 Pa.C.S. § 5512 (guardian of person of estate may be appointed by court of county where the incompetent is domiciled). We disagree as the record establishes that Dr. Sylvester had a fixed intent to live at the nursing home. Dr. English's deposition indicates that Dr. Sylvester agreed to move to the nursing home. In their affidavits, appellants both state that they each discussed the move with the doctor, that he agreed to move to the nursing home, and that he was happy with the home since moving there. Furthermore, appellants have sold the doctor's home and furnishings. Thus, the record refutes that the move was not of choice as was the case in *Coulter's Estate*, 406 Pa. 402, 178 A.2d 742 (1962), where the Supreme Court ruled that a person who moves into a nursing home due solely to physical necessity has not changed his domicile. Instead, Dr. Sylvester was cognizant of the permanent change of residence, assented to it, and was satisfied with the new arrangements. Accordingly, he changed his legal domicile to the nursing home. *See Estate of McKinley*, 461 Pa. 731, 337 A.2d 851 (1975) (domicile is place where person has voluntarily fixed his habitation with intent to make it a permanent home).

Appellants next contend that the proceedings for the appointment of the temporary guardian were improper due to a lack of notice and that the decree appointing the temporary guardian was deficient under section 5513 of the Probate, Estates, and Fiduciaries Code (the "Probate Code"), 20 Pa.C.S. § 5513. We agree with the latter argument. As to notice, however, section 5513, which governs appointment of temporary guardians, provides that notice of the appointment of a temporary guardian shall be required "as shall appear to the court to be feasible in the circumstances," and notice does not have to be given to the persons required to be given notice of permanent guardianship proceedings instituted under section 5511 of the Probate Code. The notice provision of section 5513 has been

interpreted by our Supreme Court in *Estate of Dorone*, 517 Pa. 3, 534 A.2d 452 (1987), where a temporary guardian was appointed for an unconscious patient for the purpose of consenting to blood transfusions. The patient arrived at a hospital unconscious and in immediate need of an operation to save his life. The hospital obtained the consent of the patient's parents for the operation, but based on their religious beliefs, the parents refused to give permission for necessary blood transfusions. While the patient was on the operating table waiting for the surgical procedure, his physician and the hospital administrator telephoned the orphans' court and requested the appointment of a temporary guardian under section 5513. The court immediately appointed the hospital administrator temporary guardian for the limited purpose of consenting to the blood transfusions. The incompetent's parents objected to the proceedings based on the fact that the hearing had been conducted without notice to them or their testimony. The Supreme Court approved of the procedure utilized, concluding that the hearing conducted was sufficient and that notification was properly eliminated under the dictates of section 5513 due to the circumstances.

██ Applying the reasoning of the *Dorone* opinion to the facts of this case, we conclude that the orphans' court properly dispensed with notice of the temporary guardianship proceedings to appellants. Based on the allegations of the petition, Dr. Sylvester's best interests required the immediate appointment of a temporary guardian. Those allegations presented the orphans' court with the following facts. Appellants, who were appointed attorneys-in-fact six months previously, allegedly isolated the doctor from his friends and were disposing of his assets in a manner contrary to his wishes. Appellants also were allegedly misappropriating the doctor's assets. The petition also indicates that the incompetent himself expressed concern that appellants were not acting in his best interests. The orphans' court, therefore, reasonably dispensed with notice to appellants, as it would have given them the opportunity to take

actions with the incompetent's assets that may have prevented recovery on his behalf if, in fact, misappropriation had occurred. Considering the best interests of the alleged incompetent and with only the allegations of the petition before it, the orphans' court decision to appoint a temporary guardian without notice comported with the purpose of section 5513. *See Id.* (court's criterion in a guardianship setting is best interests of the incompetent).

However, the orphans' court's failure to specify the powers of the temporary guardian in the decree was incorrect and contrary to the express provisions of section 5513. That section provides that a guardian appointed pursuant to the section "shall only have and be subject to such powers, duties and liabilities and serve for such time as the court shall direct in its decree." In the present case, the decree of the orphans' court fails to enumerate any powers that the temporary guardian was to have.

Just as section 5513 dispenses with notice when appropriate, so does it provide that the powers of a guardian so appointed be carefully circumscribed. This is necessary because the appointment itself may be based, as in this case, on ex parte communication, and those communications, as was apparently the case here, could be false. The section itself clearly envisions that *only* those powers that are required by the circumstances necessitating the appointment of the temporary guardian are to be granted in the decree and that the decree must be specific. Thus, in *Dorone*, since a temporary guardianship was needed only for the purpose of consenting to the blood transfusions, the court gave the temporary guardian the power only to consent to transfusions. In this case, the temporary guardianship was necessitated by *allegations* that the incompetent's attorneys-in-fact were abusing their trust. Accordingly, the temporary guardian's powers should have been expressly limited to an investigation into those allegations. Instead, the guardian "revoked" the power of attorney and assumed control over the incompetent's assets. Meanwhile, it appears that the allegations against appellants were unfound-

ed. Appellants immediately cooperated when contacted by the temporary guardian, and they offered to provide a full accounting of their administration of the incompetent's assets.

The temporary guardian in this case completely usurped the function of the attorneys-in-fact, even though subsequent investigation apparently would have revealed that appellants had not misused their positions but instead were acting in the incompetent's best interest by selling his home and preventing Mrs. Pfeiffer and the Merkles from seeing him. Thus, far from isolating him from friends, appellants, with the agreement of nursing home staff and the incompetent's personal physician, were not permitting people to see him who were misusing the doctor's power to prescribe medication, when he was incompetent to exercise that power, and who were attempting to remove him from nursing care that he needed. Appellants were the people in whom Dr. Sylvester entrusted his physical and financial affairs when he was competent to make that decision. The Merkles apparently initiated these guardianship proceedings based on false allegations of misuse of the incompetent's funds. Dr. Sylvester's fears about Mr. Birch attempting to obtain his money are apparently unfounded and the result of senile dementia, not fact. Proper investigation into the truth of the allegations would have obviated the need for any further proceedings.

The court further compounded its error by failing to timely notify appellants of the permanent guardianship proceedings and to consider appointing them as permanent guardians. Section 5511, which provides for the appointment of a permanent guardian, does not dispense with notice requirements but clearly provides that notice of the hearing shall be given to the incompetent, to those entitled to share in the incompetent's estate, *and* "to such other parties as the court may direct." *See In re Katic,* 294 Pa.Super 347, 439 A.2d 1235 (1982) (the court may not dispense with the notice requirements contained in section 5511).

 Section 5511 must be read together with section 5604(c)(2) of the Probate Code, which states that if a principal nominates by durable power of attorney the guardian of his estate, the "court *shall* make its appointment in accordance with the principal's most recent nomination ... except for good cause or disqualification." (Emphasis added). As appellants were to be appointed guardians in accordance with the dictates of section 5604(c)(2), they should have been provided sufficient notice of the hearing, and they also should have been provided the opportunity to present all their evidence regarding their actions as powers of attorney. In the absence of proof of good cause or disqualification based on competent evidence at the guardianship hearing, there was no need to appoint an independent party as permanent guardian.

We believe that the orphans' court in *In re Conover*, 4 Fid.Rptr.2d 200 (Bucks Co.1984), adopted a sound approach in this area. There, cousins of the alleged incompetent filed a petition for guardianship. The court conducted a full evidentiary hearing and determined that the incompetent had executed a durable power of attorney in favor of a stepsister with whom she had a long relationship. The stepsister testified at length as to her management of the incompetent's affairs, and the court was satisfied that she had acted wisely, especially in her sale of the incompetent's home once the incompetent entered a nursing home facility. The court observed that the attorney-in-fact had a complete accounting of the incompetent's assets, which she did not commingle with personal funds, and was trustworthy. The court then dismissed the guardianship proceedings as unnecessary and allowed the stepsister to continue in her function as power of attorney. *See also In re Howard*, 9 Fid.Rptr.2d 338 (York Co.1989) (where person executes durable power of attorney, court should construe this as reposing great confidence in nominee, and where nominee is trustworthy, the court should dismiss guardianship proceedings as unnecessary, allowing attorney-in-fact to continue to operate).

In the present case, the record indicates that appellants had a long, close personal relationship with Dr. Sylvester, who had no relatives. Mrs. Fagerstrom had faithfully performed all his bookkeeping for fourteen years and according to her affidavit, with very little remuneration. Mr. Birch was a close personal friend and financial advisor. While competent, Dr. Sylvester placed great confidence and trust in appellants, naming them both executors of his will and then his attorneys-in-fact. There is no indication that that trust was abused. Appellants both immediately responded to the request for financial information and cooperated completely with the temporary guardian. They properly placed Dr. Sylvester's home and furnishings on the market since he was not going to return from the nursing home. These guardianship proceedings were instituted at the request of people whose conduct was highly questionable and who should not have been seeing Dr. Sylvester. The incompetent's estate already has been charged $9,183 in guardianship fees, even though a guardianship may not have been warranted if the proceedings had been conducted with the *incompetent's* interests in mind and after proper investigation. A person has the right to chose who shall have control over his finances in the event of incompetency without interference by the courts, which should become involved only in circumstances indicating that the incompetent's interests are not being served. The evidence may establish that that was not the case herein.

Order appointing a permanent guardianship is reversed. Case is remanded for proceeding consistent with this adjudication. Jurisdiction relinquished.

BECK, J., concurs in the result.