J-A09025-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.K., AN ALLEGED INCAPACITATED PERSON | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.K. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1079 WDA 2024 |

Appeal from the Order Entered August 8, 2024
In the Court of Common Pleas of Beaver County Orphans' Court at
No(s): 2023-01314

BEFORE: NICHOLS, J., BECK, J., and LANE, J.

MEMORANDUM BY NICHOLS, J.: **FILED: July 10, 2025**

M.K. (Appellant/Respondent) appeals from the order granting the petition filed by L.R. (Appellee/Petitioner) seeking to appoint Appellee guardian of the person and estate of Appellant. Appellant argues that the orphans' court abused its discretion in granting Appellee's petition. After review, we affirm based on the orphans' court's opinion.

The orphans' court briefly summarized the relevant facts and procedural history of this case as follows:

> On December 12, 2023, [Appellee] filed a petition for adjudication of incapacity and appointment of permanent guardian. A citation was issued on [Appellant] and a hearing was scheduled for February 2, 2024. On February 5, 2024, the parties submitted an agreed order which kept the existing power of attorney, dated November 12, 2019, [in] which [Appellant] had listed [Appellee] as her agent, would remain in effect until a hearing scheduled on April 29, 2024. At the hearing, [the] parties stipulated to [Appellant's] incapacity. Following the April 29[, 2024] hearing, the court issued an order in which it found that, pursuant to *In re*

> ***Sylvester***, 598 A.2d 76, 77 (Pa. Super. 1991), there had been insufficient evidence to show that there was "good cause" that [Appellee, the] present power of attorney[,] should be disqualified or otherwise prevented from becoming [Appellant's] guardian. However, the court was not yet prepared to make a final decision on the case and instead ordered [Appellee] to prepare and submit an accounting to the court on or before July 15, 2024, and set a status conference for July 30, 2024. On August 6, 2024, following receipt of the accounting and the status conference, the court entered a final order granting [Appellee's] petition and appointing [Appellee] as guardian of the person and estate of [Appellant]. On September 5, 2024, [Appellant] filed a notice of appeal . . . .

Orphans' Ct. Op., 10/30/24, at 1 (some formatting altered). Both the orphans' court and Appellant complied with Pa.R.A.P. 1925.

On appeal, Appellant raises the following issue:

> Whether the [orphans'] court abused its discretion naming [Appellee as] Appellant's guardian, where the [the orphans' court] refuses to take into account [] Appellant's wishes, and where the relationship between [] Appellant and [Appellee] has been severed?

Appellant's Brief at 14 (formatting altered).

Appellant argues that the orphans' court's decision to appoint Appellee as Appellant's guardian was an abuse of discretion because it disregarded Appellant's wishes, overlooked the opinion of an examining clinical psychologist and court-appointed guardian *ad litem*, and failed to consider that the relationship between Appellant and Appellee had broken down. ***See id.*** at 18-28.

"Once a court determines an individual is incapacitated and in need of a guardian, it becomes the court's responsibility to appoint a person or entity to

serve as guardian." ***In re C.A.J.***, 319 A.3d 564, 572 (Pa. Super. 2024) (citation omitted).

> When deciding who shall serve as guardian of the person, the court may consider the preference of the incapacitated person. The selection of a guardian is within the sound discretion of the orphans' court, and this Court will not disturb that selection absent an abuse of discretion. The orphans' court may not, however, appoint a person whose interests conflict with those of the incapacitated person unless no other alternative exists. Any family relationship to such individual, shall not, by itself, be considered an interest adverse to the alleged incapacitated person.

***Id.*** (citations omitted and formatting altered).

> Further,

> [a] principal may nominate, by a durable power of attorney, the guardian of [her] estate or of [her] person for consideration by the court if incapacity proceedings for the principal's estate or person are thereafter commenced. The court shall make its appointment in accordance with the principal's most recent nomination in a durable power of attorney except for good cause or disqualification.

20 Pa.C.S. § 5604(c)(2).

Here, the orphans' court thoroughly addressed Appellant's arguments and concluded that she was not entitled to relief. ***See*** Orphans' Ct. Op. at 2-16. Following our review of the record, the parties' arguments, and the

J-A09025-25

orphans' court's conclusions, we discern no abuse of discretion, and we affirm on the basis of the orphans' court's opinion.[1] *See id.*[2]

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

*[signature]*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/10/2025

_____

[1] The parties are directed to attach a copy of the orphans' court's opinion in the event of further proceedings.

[2] In the last sentence of the first paragraph on page 5 of the orphans' court's opinion, there is a typo, and the word "incredible" should read "incredibly." *See* Orphans' Ct. Op. at 5. Additionally, there is a typo on page 10, and the cite to "20 Pa.C.S. § 5604(2)" should read "20 Pa.C.S. § 5604(c)(2)." *See id.* at 10. We also note that the orphans' court quotes *In re Estate of Rodgers*, 898 WDA 2018, 2019 WL 1772009 (Pa. Super. filed Apr. 22, 2019) (unpublished mem.). *See id.* at 14. While unpublished cases of the Superior Court filed after May 1, 2019, may be cited for their persuasive value pursuant to Pa.R.A.P. 126(b), *Rodgers* was filed on April 22, 2019. However, the language from *Rodgers* was a summary of factors to consider when determining whether a conflict of interest exists under 20 Pa.C.S. § 5511, and the factors noted are supported by both binding and persuasive authority. *See, e.g., Wilhelm v. Wilhelm*, 657 A.2d 34, 39 (Pa. Super. 1995); *Commonwealth, Dep't of Public Welfare v. Bean*, 558 A.2d 170 (Pa. Cmwlth. 1989); *Cruver v. Mitchell*, 656 S.E.2d 269 (Ga. Ct. App. 2008); *Matter of Waldron*, 910 S.W.2d 837 (Mo. Ct. App. 1995). This Court may rely on the decisions of other states for persuasive authority. *See Hill v. Slippery Rock Univ.*, 138 A.3d 673, 679 n.3 (Pa. Super. 2016) (noting that "the decisions of other states are not binding authority for this Court, although they may be persuasive" (citation omitted)). Further, the orphans' court thoroughly explained why "any possible adverse interests [Appellee] may have do not rise to a level which would require disqualification." Orphans' Ct. Op. at 15.

- 4 -

IN THE COURT COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

IN RE:

M███ K██████.,

An Alleged Incapacitated Person.

)  ORPHANS' COURT DIVISION
)
)  No. 2023-01314
)
)

## RULE 1925 OPINION

On December 12, 2023, Petitioner L███ R████ filed a Petition for Adjudication of Incapacity and Appointment of Permanent Guardian. A Citation was issued on Respondent ███ ██████ and a hearing was scheduled for February 2, 2024. On February 5, 2024, the parties submitted an agreed Order which kept the existing Power of Attorney, dated November 12, 2019, which Respondent had listed Petitioner as her Agent, would remain in effect until a Hearing scheduled on April 29, 2024. At the hearing, parties stipulated to the Respondent's incapacity. Following the April 29 Hearing, the Court issued an Order in which it found that, pursuant to *In re Sylvester*, 598 A.2d 76, 77 (Pa. Super. 1991), there had been insufficient evidence to show that there was "good cause" that present Power of Attorney should be disqualified or otherwise prevented from becoming the Respondent's Guardian. However, the Court was not yet prepared to make a final decision on the case and instead ordered the Petitioner to prepare and submit an accounting to the Court on or before July 15, 2024, and set a status conference for July 30, 2024. On, August 6, 2024, following receipt of the Accounting and the Status Conference, the Court entered a Final Order granting the Petition and appointing L███ R████ as Guardian of the Person and Estate of M█ K███. On September 5, 2024, Respondent filed a notice of appeal and, on October 8, 2024, a Concise Statement of Matters Complained of on Appeal. The Court enters the following Opinion under Rule 1925(a)(1).

## ISSUES RAISED

Respondents raise five issues on appeal, arguing that the Court abused its discretion when it named L____ R____ as Guardian when: (1) All testimony presented at the Hearing confirmed that the relationship between the Respondent and the Petitioner had broken down, (2) The Court Appointed Guardian Ad Litem recommended that the Petitioner not be appointed guardian, and that a neutral third-party organization be named guardian, (3) The Agent breached her fiduciary duty by refusing to comply with the wishes of the Respondent that she be allowed to return to the Respondent's residence from assisted living with the condition that necessary home care be provided to the Respondent, (4) The Petitioner had a conflict of interest in that she had allowed her brother to move into the Respondent's home and she would have to remove her brother from the Respondent's home if she were allowed to return home, (5) The Court arbitrarily ignored the report of an Expert that the principal could return home if given proper support.

## STATEMENT OF FACTS

At the Hearing, the Petitioner's first witness was A____ R____, the sister of the Petitioner and granddaughter of the Respondent. She testified that the Respondent's husband passed away in September of 2023 and that she has been residing in Villa St. Joseph in Baden, Pennsylvania, since October of 2023. *Hearing Transcript* at 12. Prior to Respondent's stay at Villa St. Joseph, she and the Petitioner were assisting the Respondent in paying her bills, maintaining her house, scheduling in-home care. *Id.* at 13-14. She was able to facilitate some of these actions, despite residing in Maryland at the time, because Respondent had a joint bank account with the witness. *Id.* at 13, 16. She would also coordinate care for Respondent through the neighbor, P____ H____ who is the Respondent's neighbor. *Id.* at 15. Presently, the Petitioner sends the bills from Villa St. Joseph to the

2

Witness to have her pay them from the joint accounts. *Id.* at 18, 19. At the time of the Hearing, the checking account held $38,082.72 and the savings account held $65,072.53. *Id.* at 19.

Respondent was receiving daily aid, roughly during COVID onwards, from Petitioner, Witness, and P███ H██. *Id.* at 20. Respondent was generally resistant to assistance, starting with not notifying anyone that her husband had been hospitalized and generally stalling any attempts to get in-home care. *Id.* at 21, 22. After in-home care was scheduled, Respondent would then cancel the appointments, lock the door, and take the phone off the hook in order to prevent the in-home care from facilitating their services. *Id.* at 22. A number of caregiving services were cycled through the home, as Respondent would accuse them of stealing. *Id.* at 23. This in-home care lasted from April of 2023 till her transfer to Villa St. Joseph in September of 2023. *Id.*

The witness testified that throughout all of these events, the Petitioner was involved and active in helping the Respondent. *Id.* at 23. She further stated that she believed the Petitioner to be the best suited to being Guardian of the Respondent. *Id.* at 26. She also outlined her concerns that a third-party Guardian may be met with resistance from the Respondent, given her pattern of behavior with the in-home caregivers. *Id.* Her concerns were also that should she return home, there are concerns given her inability to manage her own medications as she previously was not taking them properly day to day. *Id.* at 29, 30. Additionally, the witness outlined issues that plagued the Respondent while staying at home and without 24-7 care. These included: slip and falls, repeated calls that her basement was flooding when it wasn't, repeated false alarm calls to 911, a situation where a glass storm door remained broken with strewn about glass for weeks, and general resistance to in-home help agencies. *Id.* at 30-32.

On cross-examination, the Witness was asked whether the Respondent had been home since September of 2023, to which she responded that the Respondent had not been home since she was admitted to the hospital for a UTI in 2023. *Id.* at 34. She then stated that all her observations of the

3

Respondent's interactions with at-home caregivers were from March 2023 to September 2023. *Id.* She stated that she acknowledged the Respondent's desire to return home and that the decision for her to remain at Villa St. Joseph was not made lightly or without significant consideration, input from others, and a logistical and administrative analysis of the costs and benefits of at-home care versus remaining at Villa St. Joseph. *Id.* at 34, 35. She stated that she didn't believe that a third-party guardian would have made any different decisions than those made by her and the Petitioner. *Id.* at 36. She stated that the Petitioner is co-owner of Respondent's home and that when they received reports from Villa St. Joseph regarding the Respondent's prognosis, the Petitioner decided to allow their brother to rent the home in order to prevent it from remaining vacant. *Id.* at 37, 38. She claimed that the Respondent appeared to be much better since she had been placed in the care of Villa St. Joseph, but that she did not believe she would continue to improve if she returned home. *Id.* at 39. She expressed her concerns with the costs associated with full-time in home care, while noting that the facility she is in presently is fully covered by Respondent's long-term care insurance. *Id.* at 41. She further noted that said insurance would not be able to cover more than 5 hours a day of in-home care and only for the first year, she further noted that Respondent's income as she was aware of was not enough to facilitate such expenses either. *Id.* at 41-44. However, there is some question of an outstanding pension the Respondent may be entitled to relating to her late-husband. *Id.*

Next the witness was questioned by the Guardian Ad Litem. *Id.* at 46. She testified that up until the hearing, she has maintained a good relationship with Respondent, but recognizes that Respondent has become increasingly agitated and distrustful of Petitioner due to her being unable to return home. *Id.* at 46-49. She also testified that she had no real relationship with the Respondent's sisters nor was she familiar with ● H███s. *Id.*

4

Petitioner next called P⬛ H⬛, the Respondent's neighbor and friend, as a witness. *Id.* at 51. She lives three houses up from the Respondent and has served as a sort of volunteer caregiver for the Respondent for about six years. *Id.* at 52. She testified that over time, the Respondent was having difficulty taking her medications regularly and that starting around 2018 she had to assist the Respondent in taking her medications daily. *Id.* at 53, 54. She further stated that as the Respondent declined, she had several falls and had on multiple occasions left the oven on with things in it, enough that she became concerned for the Respondent's safety. *Id.* at 55, 56. She further stated that at one point the Respondent had been scammed by a caller on the telephone. *Id.* at 57, 58. In regards to the in-home caregivers, she testified that Respondent had accused the first caregiver of stealing food and various other things, but when the witness checked all of the items were still in the house. *Id.* at 58, 59. She further stated that the Respondent's mental state had declined even before her hospitalization in September of 2023. *Id.* at 60. She claimed that the Respondent was confused a lot, was unable to write things down or repeat things like phone numbers, and she was forgetting to eat. *Id.* at 60, 61. Prior to her placement in Villa St. Joseph, according to the witness, the Respondent was incredible pleased with the decisions and care dictated by the Petitioner and A⬛. *Id.* at 62.

On cross, the witness confirmed that the Respondent struggled to take her medications regularly, but refuted that any insinuation that she believed this was the source of her suspicious or aggressive behavior. *Id.* at 63, 64. Furthermore, she stated that she would regularly attend the Respondent's doctor appointments, since the Respondent would forget what was told to her by the doctors. *Id.* at 64. When questioned by the Guardian Ad Litem, she confirmed that the relationship between the Respondent and the Petitioner had broken down as a result of the Respondent's placement in a long-term care facility. *Id.* at 67-69.

The third witness called by the Petitioner was the Petitioner herself, L█████ R█████. She testified that she was the Respondent's granddaughter and her Agent under a General Durable Power of Attorney executed in 2019. *Id.* at 70-73. In 2013, Petitioner was transferred an interest in the Respondent's home by the Respondent and her husband. *Id.* at 75. She testified that in mid-September of 2023, upon Respondent's placement in Villa St. Joseph and subsequent movement to the memory care unit, she entered into a formal lease agreement with K███ K█████ in which he was renting and residing in Respondent's residence. *Id.* at 76-78. This decision was reached after recommendations by doctors that Respondent was best suited to stay at Villa St. Joseph and in consideration that neither the Petitioner nor her sister would be able to regularly check on the property. *Id.* at 77, 78. Brother pays $800 a month on a month to month lease, all of which is directed directly to Respondent's benefit. *Id.* at 78.

She testified that prior to 2023, her assistance as an agent wasn't needed as much. *Id.* at 79. Following the death of Respondent's husband, she stepped up to help deal with paying the Respondent's bills, working with P█████ to get Respondent to doctor's appointments, as well as triaging situations where she was making false alarm 911 calls. *Id.* at 79-80. She and her sister worked together to attempt to set up in-home care for the respondent using her long-term care insurance. *Id.* at 81, 82. She testified that there were significant issues with setting up at home care for Respondent. *Id.* at 82-84. Respondent did not trust the home care aides, would often not let them in the home, or would not answer the phone. *Id.* at 82, 83.

After the recommendation of 3 different physicians who were concerned for the safety and well-being of the Respondent as a result of her living home alone and that in her own opinion, things were not going well. *Id.* at 86. While the at home care was limited, Villa St. Joseph was a fantastic facility and was fully covered by the Respondent's long-term care insurance. *Id.* at 86. The Petitioner claims she was focused on making sure the Respondent was getting the best possible care. *Id.* at 87.

6

Petitioner testified that up until Thanksgiving of 2023, she and Respondent had regular contact. *Id.* at 88. After a difficult phone conversation on that day, the Petitioner and her sister decided to split their approach. *Id.* at 89. Petitioner maintains regular contact with the facility, while sister maintains communications with Respondent. *Id.* Petitioner continues to push for the Respondent to have the best quality of life possible, including having her moved to a single room. *Id.* at 91. Petitioner is in the process of moving back locally to be closer with her family and take a more active role in caring for Respondent. *Id.* at 112.

Petitioner testified that the Respondent looks better than she has in years and attributes that to her time at Villa St. Joseph. *Id.* at 89. She justifies her decision to keep Respondent in the facility due to the care she is receiving and the increased quality of life compared to being at home. *Id.* at 89, 90. She plans, if made guardian, to continue to stay in direct, regular contact with the facility to ensure the best possible care for Respondent, and to take direct control of Respondent's financial affairs. *Id.* at 90, 91. Petitioner then went on to explain her concerns that a third-party guardian service would needlessly deplete Respondent's resources and that she fears that if such a guardian was somehow convinced to remove Respondent from Villa St. Joseph, she may not be able to get a bed there again and instead end up in some lesser facility. *Id.* at 93.

On cross examination, Petitioner acknowledged that she recognized that Respondent was experiencing some stress and was unhappy to be in a facility and wished to return home. *Id.* at 94, 95. She further noted that she had concerns that Respondent has a history of not regularly taking her medications while at home, but has been compliant while at Villa St. Joseph. *Id.* at 95, 96. She recognized that no third-party guardianship was in place prior and was unable to say whether or not they would be able to successfully administer medications to Respondent. *Id.* at 96. Petitioner explained that the Respondent's decline was progressive and over years, not necessarily related to missing medications. *Id.* at 97, 98. She reaffirmed her desire to be guardian and that none of the issues raised impede her ability to care for her grandmother. *Id.* at

7

98, 99. When asked if her brother's lease would be an issue in returning Respondent to her home, she explained that he is on a month to month lease and understands that he may have to leave. *Id.* at 99, 100. In regards to the issue of the Respondent's husband's pension, she explained that she is aware of it, has submitted the proper applications, and is waiting for a response from Duquesne Light. *Id.* at 102-104.

On examination by the Guardian Ad Litem, Petitioner was questioned about her relationship with Respondent. *Id.* at 104. In regards to the difficult conversation on Thanksgiving of 2023, which the Petitioner marks as the start of the breakdown in their relationship, Petitioner states that the conversation broke down when the Respondent began to ask why Petitioner was keeping her in Villa St. Joseph. *Id.* at 105. Respondent expressed her unhappiness and claimed Petitioner was making her worse. *Id.* She also was concerned about her money, but Petitioner attempted to calm her by explaining it was in Respondent's bank account and she would be happy to show it to her. *Id.* When asked about their relationship previous to this event, she responded that it was largely good, with some rough spots when Respondent's husband was placed in a long-term care facility. *Id.* at 106. There was an issue during this time where Respondent told the facility not to contact Petitioner and instead send the invoice to Respondent, these were then unpaid and the Petitioner is in the process of settling this bill through the state. *Id.* at 107.

The Respondent's only called witness was the Respondent herself. *Id.* at 117. She stated that she wanted to go home and insinuated that Petitioner didn't know what was best for her. *Id.* at 118. When asked if she would accept help if necessary to return home, she struggled to answer the question directly, but ultimately agreed if it was necessary for her to return home. *Id.* at 119, 120. On cross-examination, she claimed to be taking her medications and that the only times she forgot in the past were when she would drop the pills in the bed at night. *Id.* at 121. She identified, generally, some of the medications she takes but indicated her confusion as to why she was being given dementia medications when she didn't see that she had a diagnosis for dementia. *Id.* at 121, 122. When asked about whether or not she would agree with a third-party guardian if they decided to keep her at Villa St. Joseph, she was non-committal and stated that there was no possibility that she would agree to stay at Villa St. Joseph. *Id.* at 125, 126. On examination by the Guardian Ad Litem, the Respondent testified that she was disappointed in the actions of the Petitioner. *Id.* at 131.

8

The Guardian Ad Litem's Report and her recommendation were submitted to the Court. The report largely supported/mimicked the testimony at the Hearing. The Guardian Ad Litem issued two suggestions, either that a private guardianship service be appointed outright or that a 6 month trial basis with a private guardianship service be imposed, with a status conference at the end of the term to see if Petitioner and AIP could reestablish a positive relationship. *Guardian Ad Litem's Report* at Page 7. At the Hearing, the Guardian Ad Litem stated that she was leaning towards the second option after hearing the testimony. *H.T.* at 116. The Guardian Ad Litem cites the stress and frustration that the Respondent has regarding her relationship with the Petitioner as "good cause" under 20 Pa. C.S. § 5604(2) to exclude the Petitioner from becoming Guardian. *GAL Report* at 7. It is worth noting that the Guardian Ad Litem recognizes that the Petitioner has acted with the Repondent's best interests in mind and believes that the animosity towards the Petitioner is a result of the Respondent's dementia and confusion. *Id.* at 5.

Two expert reports were submitted to the Court, along with their findings, both of which supported a finding of incapacity. The Court reviewed the testimony at trial, the expert reports, and the Guardian Ad Litem's report and ultimately found that there was insufficient evidence presented to support the disqualification of the Petitioner as Guardian. The Court issued an order finding the Respondent to be incapacitated and leaving the Power of Attorney in place with a full guardianship transition pending the filing of an accounting of the Respondent's assets by the Petitioner. Upon receipt of this accounting, the Court issued a Final Order appointing the Petitioner as Guardian of the Estate and Guardian of the Person of Respondent, M███.K███. Furthermore, the Court set forth a review hearing on December 6, 2024, at 9:00 a.m. in order to continue to assess and monitor Respondent's status. Respondent subsequently filed the instant Notice of Appeal and Concise Statement of Matters on Appeal.

9

## DISCUSSION

Appellate courts must "accord the findings of an Orphans' Court judge the same weight and effect as a jury verdict," may "not disturb those findings absent manifest error," and may "modify an Orphans' Court decree only if the findings upon which the decree rests are unsupported by competent or adequate evidence or if there has been an error of law, an abuse of discretion, or a capricious disbelief of competent evidence." *Appeal of Gannon*, 631 A.2d 176, 182 (Pa. Super. 1993) (*citing In re Benson*, 615 A.2d 792, 793 (Pa. Super. 1992)).

Furthermore, due to the existence of a previous binding General Durable Power of Attorney which places the Petitioner as Guardian should the Respondent become incapacitated, the Court is required to make such an appointment unless it is shown there is good cause not to or otherwise a disqualification. 20 Pa. C.S. § 5604(2).

Appellant argues that the Court abused its discretion when it appointed L█████ R█████ as the Guardian in light of the following:

1. **All testimony presented at the Hearing confirmed that the relationship between the Respondent and the Petitioner had broken down.**

The Court recognizes that the Respondent is unhappy with her current placement at Villa St. Joseph and that she blames the Petitioner for her placement there. However, this Court has heard clear and convincing evidence that even though their relationship is strained, the Petitioner has behaved excellently in pursuing the best care available for the Respondent. Furthermore, the Court finds persuasive the testimony relating to the Respondent's general resistance to outside help and assistance in regards to her well-being and independence. *See H.T.* at 21-23, 29-30, 58-59, 82-84. Additionally, both the testimony at trial, the Respondent's own statements, and the Respondent's expert report all indicate that the Respondent is unaware of how much assistance she actually needs

10

and is only amicable to the idea of help if it allows her to return home. *See H.T.* at 119-120, 121, 125-126, *See also Deposition of Dr. Harris* at 44-45. *Deposition of Dr. Kwiat* at 16.

The Court believes that it is fairly obvious that the Respondent will continue her behavior one way or the other. Should a third-party guardian be appointed and she be allowed to return home, it is reasonable based on the evidence to assume that she will continue to be avoidant and dismissive of any outside help. The more likely case, given the facts presented, is that a third-party guardian would see fit to have her remain at Villa St. Joseph. In such case, she would likely have the same breakdown and stress as she has had with the Petitioner. *See Dr. Kwiat* at 19.

Given this double-edged sword situation, the Court is inclined to look instead to the Petitioner's behavior in light of the circumstances, her efforts in meeting the needs of the Respondent, and her efforts to follow the wishes of the Respondent. It is undisputed that the Respondent is incapacitated and, by expert testimony, unable to take care of herself and make decisions about her well-being. The Petitioner has admirably performed her duties as agent, even in spite of the relationship breakdown. Respondent has been placed in one of, if not the, premier care facilities in Beaver County. *See H.T.* at 86, *See also Dr. Kwiat* at 18. Petitioner has managed the Respondent's assets in such a way that they Respondent's estate has actually grown under her watch. *See Petitioner's Accounting.* Furthermore, Petitioner has taken steps to ensure that, despite keeping her in the facility, Respondent is as comfortable as possible and being well taken care of. This is evidenced by her successfully acquiring an individual room for Respondent and being in constant contact with the facility in regards to Respondent's care. *H.T.* at 87-89, 91.

Given the above, this Court finds that the relationship breakdown such as it is, is not grounds for disqualification of Petitioner as Guardian.

11

## 2. The Court Appointed Guardian Ad Litem recommended that the Petitioner not be appointed guardian, and that a neutral third-party organization be named guardian.

The Court does not go against the recommendation of the Guardian Ad Litem lightly and fully considered their submitted report before reaching a decision. The GAL's recommendation placed heavy weight on the breakdown in the relationship between the Petitioner and the Respondent. *See Guardian Ad Litem's Report* at 6-7. The Court remains unconvinced that this breakdown has impeded the Petitioner from caring for Respondent or otherwise making decisions that are in the Respondent's best interests. As outlined above, the Petitioner is still able to take the Respondent's desires and needs into consideration and has done her best to meet these wants and needs. The entire breakdown arises from the decision for the Respondent to remain in long-term care, which has only served to her benefit by all evidence provided. The Court believes that, given the financial situation of the Respondent, the Respondent's age, her past behavior, and her incapacity, that a third-party guardian is likely to make the same decision to maintain Respondent's residency at the long-term care facility. Should this occur, evidence suggests that Respondent will have similar relationship issues with the third-party guardian.

Given this, and for similar reasons as outlined above, the Court rejected the recommendation of the GAL.

12

3. The Agent breached her fiduciary duty by refusing to comply with the wishes of the Respondent that she be allowed to return to the Respondent's residence from assisted living with the condition that necessary home care be provided to the Respondent.

The fiduciary duty of an agent to an incapacitated principal is to act in within the reasonable expectations of the principal as known to the agent, otherwise, in the best interests of the principal. 20 Pa. Stat. and Consol. Stat. Ann. § 5601.3. When dealing with an incapacitated person, the standard of review of an agent's/guardian's actions is whether the action was taken in the best interest of the principal, and in light of insufficient evidence of such, whether the action comported with the wishes of the incapacitated. *In Re: A.B.*, 285 A.3d 936 (2022).

Here, it is clear that the Respondent has no desire to be in a long-term care facility and wants to return home. However, it is worth noting that this was never explicitly stated or laid out in writing until after the Respondent was placed in a facility and had become incapacitated. The Petitioner has clearly demonstrated through testimony, that she and her sister took into consideration the Respondent's wish to return home, but believed that given her previous resistance to at-home care, the lack of adequate funding from Respondent's long-term care insurance and her general assets, as well as her need for regular care and assistance, that her best interests were better served by being placed in a facility where she could get the care she needs while being fully covered by her long-term care insurance. *See H.T.* at 41, 86. Furthermore, the Court recognizes that there would be considerable risks in removing the Respondent from the facility she is currently in. There is no guarantee that Respondent would be able to return to the high-level facility that she is in, should home care not work out. *See H.T.* at 93. This could leave her in a lesser facility where she will not receive the same quality of care than she is currently receiving.

The Court sees no reason to discredit the testimony of either the Petitioner, nor her sister, and has likewise found that they have acted with the best-interests of the Respondent in mind, given the

13

Respondent's history of behavior and the conditions surrounding the case. Furthermore, the Petitioner has performed the duties as Respondent's agent well within the guidelines of her fiduciary duty.

4. **The Petitioner had a conflict of interest in that she had allowed her brother to move into the Respondent's home and she would have to remove her brother from the Respondent's home if she were allowed to return home.**

The Court agrees that, under different facts and circumstances, the Petitioner's shared ownership of the Respondent's home could lead to disqualification.

> The determination of a conflict of interest is properly informed by the relationship between the incapacitated person and the proposed guardian before the incapacity arose, by whether the proposed guardian stands to benefit later from her non-use of funds for the benefit of the ward during the guardianship, and by the actions taken by the proposed guardian after incapacity arose but before guardianship proceedings commenced.

*In re: Est. of Rodgers*, No. 898 WDA 2018, 2019 WL 1772009 (Pa. Super. 2019).

The Court carefully considered the facts surrounding the Petitioner's co-ownership of the Respondent's property. In determining whether this interest is disqualifying, this Court looked to the totality of facts surrounding the case. The transfer of the interest, occurred several years before either the Power of Attorney was created or the Respondent's incapacity was determined. *H.T.* at 75. Petitioner has not, in any way, enriched herself at the Respondent's detriment. In fact, according to credible testimony, the Respondent's home was only leased to Petitioner's brother in hopes to maintain the property in the Respondent's absence. *Id.* at 37, 76-78. Furthermore, the proceeds of the lease are entirely put towards the benefit of the Respondent, Petitioner does not take in any proceeds from the rent despite having partial ownership of the property. *Id.* at 78. Additionally, as opposed to a private tenant, Petitioner placed a family member in the home on a month to month

14

lease, with the knowledge that they may need vacate the property in order to facilitate the return of the Respondent. *Id.* Finally, Petitioner's accounting shows growth of the Respondent's assets while under her control. *See Petitioner's Accounting.*

In analyzing these facts through the cited analysis, the Court first considers that the Petitioner and Respondent had a very close relationship prior to the Respondent's incapacity. There is no evidence to suggest that Petitioner ever sought to enrich herself at the Respondent's detriment before, during, or after Respondent was rendered incapacitated. Petitioner stands to benefit as a beneficiary from maintaining or growing the Respondent's assets, she also stands to benefit from maintaining the home that she is a co-owner of. However, the Petitioner's explanation of her actions sheds light on her motivations. Petitioner outlined that the Respondent's financial situation would not be able to support Respondent's return home with the required level of care, and that she believed Respondent was better cared for at the long-term care facility. Since the Respondent's incapacity, the Petitioner has helped grow and maintain the Respondent's assets. She has not shown any malfeasance or self-dealing, nor any attempts at self-dealing or self-enrichment at the detriment to the best interests of the Respondent.

The Court is convinced by these facts that any possible adverse interests the Petitioner may have do not rise to a level which would require disqualification.

15

5. The Court arbitrarily ignored the report of an Expert that the principal could return home if given proper support.

This was not the issue before the Court to decide. The Court gave both expert reports their due weight in regards to the Respondent's incapacity and other facts relevant to the issue of whether or not to honor the Respondent's Power of Attorney document or instead to appoint a third-party guardianship service. It would ultimately be for the Respondent's guardian to determine whether or not it was appropriate for Respondent to return home.

5. The Court arbitrarily ignored the report of an Expert that the principal could return home if given proper support.

This was not the issue before the Court to decide. The Court gave both expert reports their due weight in regards to the Respondent's incapacity and other facts relevant to the issue of whether or not to honor the Respondent's Power of Attorney document or instead to appoint a third-party guardianship service. It would ultimately be for the Respondent's guardian to determine whether or not it was appropriate for Respondent to return home.

## CONCLUSION

For the foregoing reasons, the Court concludes that the issues raised in Respondents' Concise Statement of Matters Complained of on Appeal are without merit. The Register of Wills is directed to file the record of these proceedings with the Superior Court.

BY THE COURT:

DALE M. FOUSE
JUDGE

2024 OCT 30 A 11: 23

BY THE COURT

16